# [TRANSLATION]

### AFFIDAVIT OF JEAN CARON
### IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

The undersigned, Jean Caron, on oath and upon personal knowledge, hereby states as follows:

1.    I am over eighteen (18) years of age, and understand and believe in the obligations of taking an oath.

2.    I am a citizen of the nation of France.

3.    My native language is French. I do not speak or read English fluently.

4.    Prior to my employment with Cognex International, Inc. ("Cognex International"), I worked with the Université de Lille and the Université du littoral in a Vision Laboratory from 1992 to 1996. I had worked for several companies developing vision systems to complete my work toward a doctoral degree in the field of Industrial Machine Vision and needed to complete my final examinations. I also published several papers on the science of machine vision systems in academic and trade publications. From 1996 to 1998, I was employed by the Bernhardt company, in Boulogne-sur-Mer, in France, in order to pursue my research and development work in the Industrial Machine Vision sector.

5.    I was first approached regarding employment with Cognex International in October 1997. Cognex International did not offer me employment at that time because my availability did not meet their needs.

6.    Cognex International again approached me regarding employment in January 1998. I engaged in discussions with Cognex International regarding employment as a Vision Solutions Engineer. In late January 1998, Cognex International extended an employment offer and gave me a draft Contrat de Travail written in French. The proposed Contrat de Travail included an anticipated start date of March 2, 1998.

# [TRANSLATION]

7.    Throughout my discussions with Cognex International, my prospective employment was discussed exclusively in terms of the provisions of the applicable national collective bargaining agreements and French labor law. No provision that would limit my employment opportunities when I left Cognex International was discussed or included in the draft Contrat de Travail that I received in January 1998.

8.    I accepted Cognex International's employment offer and began working as a Vision Solutions Engineer at the company's facility in Rueil-Malmaison, a suburb of Paris, France on March 16, 1998.

9.    When I arrived at Cognex International's Rueil-Malmaison facility on my first day of my employment, Alain Duflot, who is Cognex International's Western Europe Customer Satisfaction Manager and was my direct supervisor, presented me with several documents to sign. One was the "Contrat de Travail" that I received a copy of in late January 1998. The other documents were a no-smoking policy and a document called an "Employee Invention, Non-Disclosure and Non-Competition Agreement," which I will refer to as the "English Agreement". The no smoking policy and the English Agreement were written entirely in English.

10.    My understanding is that under the Contrat de Travail, my employment with Cognex International was controlled by the French national collective bargaining agreement "Syntec" and more generally by French labor laws. The Contrat de Travail contains provisions that limited my ability to compete with the company during my employment (Article 2), restricts the disclosure of Cognex International's confidential information (Article 7), addresses ownership of developments (Article 8), and restricts solicitation of Cognex International's employees (Article 9). The Contrat de Travail does not contain any provisions limiting my right to work for any employer, including Cognex International's competitors, after the termination of my employment with Cognex International.

# [TRANSLATION]

11.    I changed the date on the signature page on the Contrat de Travail and wrote in March 16, 1998, and signed the document. The document was countersigned by Eric Ceyrolle, Vice President of European Operations on behalf of Cognex International. A true copy of the Contrat de Travail is attached as Exhibit A.

12.    The no-smoking policy was written entirely in English. I discovered during my employment with Cognex International that the no-smoking policy was regularly disregarded by Cognex International's European supervisors and employees.

13.    I was not provided a translation of the English Agreement into French or any other language. A true copy of the English Agreement is attached as Exhibit B. I attempted to read the English Agreement, but could not understand it because it is written in complex English. No one explained the significance of the English Agreement to me or that it contained any restrictions not included in my Contrat de Travail. I assumed that the English Agreement contained the same restrictions as in my Contrat de Travail and I was being asked to sign an English language version because English is the "official company language" of Cognex International.

14.    My primary concern with the restrictions in the Contrat de Travail (and so the English Agreement) was that it might affect my ability to complete my doctoral degree. I planned to work on nights and weekends to finish the work on machine vision systems that I was designing for other companies before I began employment with Cognex International. For this reason, I detailed my work in the industrial machine vision field and submitted it to Cognex International. A copy of this document was appended to the English Agreement as Exhibit 2.

15.    I signed the English Agreement at Cognex International's facility at Rueil-Malmaison on or about March 16, 1998. To the best of my knowledge, no one ever

# [TRANSLATION]

countersigned the English Agreement on behalf of Cognex International or Cognex Corporation.

16.    At the time I signed the English Agreement, I had no knowledge of American law generally or of Massachusetts law specifically. I did not consult with legal counsel about the English Agreement. I did not understand that by signing the English Agreement that I would be limiting my right to work after leaving my employment with Cognex International, or that I might be called upon to go to Massachusetts or anywhere else in the United States to defend a lawsuit brought by Cognex International or Cognex Corporation.

17.    I did not receive any additional remuneration or indemnification for signing the English Agreement when I signed it or at any other time.

18.    On April 1, 2001, I was promoted by Cognex International to the position of Senior Vision Solutions Engineer. I was not asked to sign another Contrat de Travail or another agreement like the English Agreement in connection with this promotion.

19.    On about December 20, 2002, John Deluca, Human Resources Manager for Cognex International, asked me to sign an amendment to my Contrat de Travail ("Avenant au Contrat de Travail"). This document amended the Contrat de Travail by bringing my working hours into conformity with recent revisions to the national "Syntec" agreement and French labor law. I reviewed and signed this document at Cognex International's Rueil-Malmaison facility. Eric Ceyrolle countersigned the document on behalf of Cognex International. A true copy of the December 20, 2002 Avenant au Contrat de Travail is attached as Exhibit C.

20.    Throughout my employment with Cognex International, I lived and resided in France, principally in Nanterre, and my primary work location was at the Rueil-Malmaison facility. My customers were primarily based in France, Switzerland, Italy and Spain. I never visited customers outside of Europe.

-4-

# [TRANSLATION]

21.    During my employment with Cognex International I had very little contact with employees of Cognex Corporation living or working in the United States. My contacts with Cognex Corporation's American employees were limited to a few e-mail messages each year with Cognex Corporation's Research and Development Engineers for the purpose of discussing how to use a Cognex Corporation product in a specific situation.

22.    My supervisors at Cognex International were Didier Lacroix, Regional Sales Director Southern Europe; Ignacio Ocadiz, International Customer Satisfaction Manager; and Alain Duflot. Each of these supervisors is a French national who worked at Cognex International's Rueil-Malmaison facility. I did not receive directions regarding my work for Cognex International from anyone living or working in the United States.

23.    All administrative matters concerning my employment with Cognex International were handled locally at the company's Rueil-Malmaison facility. I was paid under a French payroll system and paid into the French social security system. The number of vacation days I received, the number of hours I worked per week, and all other such matters were decided locally according to the national "Syntec" agreement and French labor law. All of my travels for Cognex International were arranged through a French travel agency, and my expenses were reported to and reimbursed by Cognex International in French Francs and then in Euros. Additionally, all performance appraisals I received as an employee of Cognex International were prepared by my supervisors at the company's Rueil-Malmaison facility.

24.    In a performance review dated January 22, 2002, Alain Duflot indicated that I needed to improve my English language skills. A true copy of this performance review is attached as Exhibit D. To help me improve my English language skills, Cognex International enrolled me in a nine-month English language course to improve my reading, writing, and

speaking skills. I attended the course but did not complete it before I left my employment with Cognex International.

25.    I terminated my employment with Cognex International pursuant to the requirements of the Contrat de Travail and the national "Syntec" agreement and French labor law. By letter dated June 16, 2003, I resigned my employment with Cognex International with three months notice. I sent this letter through the French post by registered mail, return receipt requested, to my supervisor, Didier Lacroix, at Cognex International's Rueil-Malmaison facility. A true copy of my resignation letter is attached as Exhibit E.

26.    By letter dated June 27, 2003, I asked to be released from being required to work for the entire notice period of the Contrat de Travail, also in accordance with the Contrat de Travail and the national "Syntec" agreement and French labor law. I sent this letter through the French mail system by registered mail, return receipt requested, to Didier Lacroix at Cognex International's Rueil-Malmaison facility. A true copy of this letter is attached as Exhibit F.

27.    Cognex International unconditionally approved my request to be released from working during the entire notice period under the Contrat de Travail by letter dated June 30, 2003. This letter was presented to me in hand by Sybille de Monplanet, Cognex International's Human Resources Manager at Cognex International's Rueil-Malmaison facility. A true copy of this letter is attached as Exhibit G.

28.    On September 19, 2003, Cognex International presented me with a Certificat du Travail, which states that I left the company that day "free of all duties and obligations". The Certificat du Travail was delivered to me in hand by Sybille de Monplanet at Cognex International's Rueil-Malmaison facility on my last day of work there. A true copy of the Certificat du Travail is attached at Exhibit H. Cognex International also presented me with

# [TRANSLATION]

another certificate required by French labor law upon termination of employment, the "Recu pour solde de tout compte". A true copy of that document is also attached at Exhibit I.

29.    No one at Cognex International nor Cognex Corporation ever informed me that my right to work after leaving Cognex International was restricted in any way until I received copies of the papers associated with this law suit. I have never received any form of payment from Cognex International or Cognex Corporation in consideration for any agreement not to compete, as I understand would be required under French law.

30.    In connection with my efforts to obtain employment, I sent my resume to the Chief Executive Officer of Euresys, S.A. ("Euresys") in Belgium. I subsequently received and accepted an offer of employment while I was at the Euresys facility in Belgium.

31.    I began work as a Technical Services Manager for Euresys at the company's Angleur, Belgium facility on October 1, 2003.

32.    The major customers for which I developed applications with Cognex products were Delphi in France and Systel-Greta in Italy. To the best of my knowledge, Cognex does not do business in Belgium. I have not been in contact with these customers since I left Cognex International. I did not have any contact with Shinkawa, Hitachi, Ismeca or Europlacer employees when I was with Cognex International.

33.    It would be an overwhelming hardship on me to appear in Massachusetts to litigate any claims brought by Cognex. I have no connection to the United States generally or to Massachusetts specifically.

Signed under the pains and penalties of perjury this 5 day of November, 2004.

_____/S/_____
Jean Caron

-7-

I, Mielle C. Nichols, do hereby declare as follows:

1.    I am an attorney licensed to practice law in Belgium, and of-counsel to the law firm of Seyfarth Shaw. I work at Seyfarth Shaw's Brussels, Belgium office, and am fluent in both French and English, meaning I can easily speak, read and write in both languages.

2.    The attached document is a true and accurate English translation of an affidavit signed by Jean Caron on November 5, 2004, in support of a motion to dismiss.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was signed on Friday, November 5, 2004 in Brussels, Belgium.


_____
Mielle C. Nichols

### DECLARATION DE MONSIEUR JEAN CARON
### À L'APPUI DE SA REQUÊTE DE FIN DE NON-RECEVOIR

Je soussigné, Jean Caron, déclare sur parole, et à ma meilleure connaissance que :

1.    Je suis âgé de plus de dix-huit (18) ans, et je suis conscient de ce que représente une déclaration sur parole.

2.    Je suis de nationalité française.

3.    Ma langue maternelle est le français. Je ne parle pas l'anglais couramment.

4.    Avant d'être employé par Cognex International, Inc. (ci-après « Cognex International »), j'ai travaillé pour l'Université de Lille et l'Université du Littoral dans un laboratoire de vision, et ce, de 1992 à 1996. J'ai développé pour plusieurs sociétés des systèmes de vision linéaire dans le cadre notamment de mon doctorat, épreuve que j'entreprenais dans le domaine de la vision linéaire industrielle. J'ai également publié plusieurs articles dans des revues académiques et professionnelles spécialisées, sur le sujet des systèmes de vision linéaire. De 1996 à 1998 je fus employé par la Société Bernhardt à Boulogne-sur-Mer en France afin de continuer mon travail de recherche et développement en vision linéaire industrielle.

5.    La première fois que je fus contacté par Cognex International, ce fut en octobre 1997. Cognex International ne m'a pas offert d'emploi à cette époque, en raison de mon manque de disponibilité.

6.    Cognex International m'a re-contacté en janvier 1998, me proposant à nouveau un emploi. J'ai alors négocié mon engagement par Cognex International en qualité d'Ingénieur Vision Solutions. Vers la fin du mois de janvier 1998, Cognex International m'a fait une offre d'emploi et m'a remis, à cette occasion, un projet de contrat de travail, établi en français. Le contrat de travail mentionnait comme date d'embauche le 2 mars 1998.

7.    Tout au long de mes discussions avec Cognex International, nous avons examiné mon embauche potentielle essentiellement à la lumière de la convention collective applicable et du droit social Français. Aucune disposition limitant mes capacités d'embauche après mon travail chez Cognex International n'a fait l'objet de discussion entre nous et le projet de contrat de travail que l'on m'avait remis en janvier 1998 ne contenait aucune clause restrictive.

8.    J'ai accepté l'offre d'embauche de Cognex International et j'ai commencé à travailler en qualité d'Ingénieur Vision Solutions au sein de l'établissement de la société dans la banlieue parisienne, à Rueil-Malmaison (France), à partir du 16 mars 1998.

9.    Quand je suis arrivé chez Cognex International, à Rueil-Malmaison, le premier jour de travail, Monsieur Alain Duflot, Directeur de Satisfaction de Clientèle en Europe Occidentale et mon supérieur hiérarchique direct, me présenta plusieurs documents à signer.  Un de ces documents était le « contrat de travail » dont une copie m'avait été remise déjà fin janvier 1998.  Les autres documents étaient : un règlement d'interdiction de fumer (no-smoking policy) ainsi qu'un document appelé « Employee Invention, Non-Disclosure and Non-Competition Agreement », que, dans la présente déclaration, j'appellerai « le Contrat Anglais ».  Le règlement d'interdiction de fumer et le Contrat Anglais étaient tous les deux entièrement rédigés en anglais.

10.    A ma connaissance, mon contrat de travail et mon emploi par Cognex International étaient entièrement régis par la convention collective « Syntec » et plus généralement par le droit social français. Mon contrat de travail contenait des dispositions interdisant des activités concurrentielles pendant toute la durée du contrat (Article 2), interdisant la divulgation d'information confidentielle de Cognex

-2-

International (Article 7), précisant la propriété des découvertes et inventions (Article 8) et interdisant le débauchage des salariés de Cognex International (Article 9). Mon contrat de travail ne comportait aucune disposition limitant mon droit de travailler pour un autre employeur, même auprès d'un concurrent de Cognex International, à la cessation du contrat.

11.    J'ai modifié la date de signature reprise sur le contrat de travail, pour le 16 mars 1998, et j'y ai apposé ma signature.  Le document fut alors signé par Eric Ceyrolle, Vice Président des Opérations Européennes, au nom de Cognex International.  Une copie conforme de mon contrat de travail est jointe à la présente, en Annexe A.

12.    La réglementation d'interdiction de fumer était rédigée entièrement en anglais. J'ai constaté par la suite, durant mon emploi chez Cognex International, que cette réglementation d'interdiction de fumer était régulièrement ignorée par les employés et cadres européens de Cognex International.

13.    Je n'ai jamais reçu de traduction en français ou une autre langue, du Contrat Anglais. Une copie conforme du Contrat Anglais est jointe à la présente, en Annexe B. J'ai essayé de lire le Contrat Anglais mais je ne suis pas arrivé à le comprendre, les termes utilisés étant complexes. Personne ne m'a expliqué la valeur du Contrat Anglais ni ne m'a signalé que celui-ci contenait des restrictions autres que celles figurant dans mon contrat de travail. Je pensais que le Contrat Anglais contenait les mêmes restrictions que celles existant dans mon contrat de travail, et que l'on me demandait de signer une version anglaise parce que l'anglais est la langue « officielle » de Cognex International.

14.    Mon premier souci à l'égard des restrictions contenues dans mon contrat de travail (et par conséquent dans le Contrat Anglais) fut qu'elles risquaient de porter

atteinte à ma faculté de terminer mon doctorat. Je comptais travailler durant les nuits et les week-ends pour terminer le travail commencé sur les machines de systèmes de vision que j'ai créés pour d'autres sociétés avant que je ne commence mon emploi chez Cognex International. Pour cette raison, j'ai fourni les détails de ce travail dans le domaine des systèmes de vision industrielle, détails que j'ai transmis à Cognex International. Une copie de ce document a été annexée, en « Exhibit 2 », au Contrat Anglais.

15.     J'ai signé le Contrat Anglais chez Cognex International, à Rueil-Malmaison, aux alentours du 16 mars 1998. A ma connaissance, personne n'a signé, au nom de Cognex International ou Cognex Corporation, ledit document.

16.     A l'époque de ma signature du Contrat Anglais, je n'avais aucune connaissance du droit américain ou, plus particulièrement, du droit de l'état du Massachusetts. Je n'ai pas consulté un conseillé juridique au sujet du Contrat Anglais. Je ne comprenais pas qu'en signant le Contrat Anglais, je limitais ma liberté de travailler après cessation de mon contrat de travail avec Cognex International, ou que je pourrais être appelé à me déplacer jusqu'au Massachusetts ou ailleurs aux Etats-Unis, par défendre les intérêts de Cognex International ou Cognex Corporation dans le cadre d'un éventuel litige.

17.     Je n'ai jamais reçu de rémunération supplémentaire ou indemnité pour la signature du Contrat Anglais, à l'époque de ma signature ou à tout autre moment.

18.     Le 1er avril 2001, j'ai été promu Ingénieur Senior de Vision Solutions. On ne m'a pas demandé de signer une nouvelle convention à cette époque, ou un autre document ressemblant au Contrat Anglais, dans le cadre de cette promotion.

19.     Aux alentours du 20 décembre 2002, John Deluca, Directeur des Ressources Humaines pour Cognex International, m'a demandé de signer un avenant à mon

contrat de travail. Cet avenant modifiait mon contrat de travail afin de réduire mes heures de travail pour se conformer aux récentes modifications législatives apportées à la convention collective Syntec et au droit social français. J'ai relu et signé ce document chez Cognex International, à Rueil-Malmaison. Eric Ceyrolle a signé le document au nom de Cognex International. Une copie conforme de l'avenant du 20 décembre 2002 au contrat de travail est jointe à la présente, en Annexe C.

20.    Durant mon emploi chez Cognex International, j'ai vécu et résidé en France, principalement à Nanterre, et mon lieu de travail fut principalement l'établissement de Rueil-Malmaison. Mes clients étaient principalement établis en France, en Suisse, en Italie et en Espagne. Je n'ai jamais rendu visite à des clients en dehors de l'Europe.

21.    Durant mon emploi chez Cognex International, j'avais très peu de contacts avec les employés de Cognex Corporation ou ceux travaillant aux Etats-Unis. Mes contacts avec les employés américains de Cognex Corporation furent réduits à quelques emails par an avec les ingénieurs en Recherche et Développement de Cognex Corporation pour discuter de la manière d'utiliser un produit Cognex Corporation dans un contexte spécifique.

22.    Mes supérieurs hiérarchiques chez Cognex International furent Didier Lacroix, le Directeur Régional des Ventes pour l'Europe du Sud, Ignacio Ocadiz, le Directeur International de Satisfaction de Clientèle et Alain Duflot. Chacun de ces supérieurs hiérarchiques est de nationalité française et travaillait auprès de Cognex International, à Rueil-Malmaison. Je n'ai jamais reçu d'ordre ou d'instruction venant d'une personne vivant ou travaillant aux Etats-Unis, concernant mon travail pour Cognex International.

23.    Toutes les questions d'ordre administratif concernant mon emploi chez Cognex International étaient gérées localement, à Rueil-Malmaison. J'étais rémunéré

conformément au système français et assujetti au système de sécurité social français. Le nombre de jours de vacances payées que je recevais, ainsi que le nombre d'heures de travail hebdomadaire, et toutes autres matières, étaient régis par la convention collective Syntec et le droit social français. Tous mes déplacements à l'étranger effectués pour Cognex International, étaient organisés par une agence de voyage française, et mes frais de représentations étaient communiqués et puis remboursés par Cognex International en Francs français puis en Euros. Par ailleurs, tous les rapports d'évaluation de mon travail que je recevais lors de mon emploi chez Cognex étaient préparés par mes supérieurs hiérarchiques à Rueil-Malmaison.

24.     Dans un rapport d'évaluation daté du 22 janvier 2002, Monsieur Alain Duflot avait, entre autres, indiqué que je devais améliorer mon anglais. Une copie conforme de ce rapport d'évaluation est jointe à la présente, en Annexe D.  Pour m'aider à améliorer mon anglais, Cognex International m'a inscrit à un cours d'anglais afin d'améliorer mes facultés de lecture, d'écriture et de conversation en langue anglaise. J'ai suivi ces cours mais je ne les ai pas terminés avant d'avoir quitté mon emploi chez Cognex International.

25.     J'ai mis fin à mon emploi chez Cognex International conformément aux dispositions reprises dans mon contrat de travail, la convention collective Syntec et le droit social français. J'ai remis ma démission par courrier du 16 juin 2003, avec un préavis de trois mois.  J'ai envoyé ce courrier par la poste française, par recommandé avec accusé de réception, adressé à mon supérieur hiérarchique, Didier Lacroix, chez Cognex International, à Rueil-Malmaison. Une copie conforme de cette lettre de démission est jointe à la présente, en Annexe E.

26.     Par lettre du 27 juin 2003, j'ai sollicité l'accord d'être dispensé d'effectuer la totalité de mon préavis requis conformément à mon contrat de travail, ainsi que

conformément à la convention collective Syntec et le droit social français. J'ai envoyé ce courrier par la poste française, par recommandé avec accusé de réception, adressé à mon supérieur hiérarchique, Didier Lacroix, chez Cognex International, à Rueil-Malmaison. Une copie conforme de cette lettre de démission est jointe à la présente, en Annexe F.

27.    Cognex International a irrévocablement accepté ma demande de dispense d'effectuer la totalité de mon préavis et ce par lettre du 30 juin 2003. Cette lettre me fut remise en main propre par Sybille de Monplanet, Directrice des Ressources Humaines auprès de Cognex International à Rueil-Malmaison. Une copie conforme de cette lettre est jointe à la présente, en Annexe G.

28.    Le 19 septembre 2003, Cognex International m'a remis un certificat de travail, attestant que je quittais la société « libre de tout engagement ». Le certificat de travail m'a été remis en main propre par Sybille de Monplanet lors de mon dernier jour de travail auprès de Cognex International, à Rueil-Malmaison. Une copie conforme de ce certificat de travail est jointe à la présente, en Annexe H. Cognex International m'a également remis un autre document requis par le droit social français, à savoir le « reçu pour solde de tout compte ». Une copie conforme de ce document est également jointe à la présente, en Annexe I.

29.    Personne chez Cognex International ou Cognex Corporation ne m'a informé que ma liberté de travail était limitée de quelque manière que ce soit, après mon départ de chez Cognex International, et ce jusqu'à ce que je reçoive copie des documents relatifs à ce litige. Je n'ai jamais reçu de paiement de quelque nature que ce soit, de Cognex International ou de Cognex Corporation, en vue de l'exécution d'une obligation de non concurrence, comme cela est requis en droit français, à ma connaissance.

30.    Dans le cadre de ma recherche d'emploi, j'ai envoyé mon curriculum vitae au Chief Executive Officer d'Euresys S.A. (ci-après « Euresys »), en Belgique. J'ai par la suite reçu et accepté une offre d'emploi qui m'a été présentée lorsque je me trouvais en visite à Euresys, en Belgique.

31.    Le 1er octobre 2003, j'ai commencé à travailler chez Euresys, en qualité de Directeur Services Techniques, au sein de leur entreprise à Angleur, en Belgique.

32.    Les clients principaux pour lesquels je développais des applications avec des produits Cognex étaient Delphi en France et Systel-Greta en Italie. A ma connaissance, Cognex n'a pas d'affaire en Belgique. Je n'ai pas été en contact avec ces clients depuis que j'ai quitté Cognex International. Je n'avais jamais eu de contact avec des employés auprès de Shinkawa, Hitachi, Ismeca ou Europlacer lorsque je travaillais chez Cognex International.

33.    Il me serait particulièrement contraignant de devoir me présenter au tribunal du Massachusetts dans le cadre du litige introduit par Cognex. Je n'ai aucun contact avec les Etats-Unis en général, ni avec le Massachusetts en particulier.


Signé en ce 5 novembre 2004, sous peine de parjure.



_____

Jean Caron

**Exhibit A**

[TRANSLATION]

## EMPLOYMENT AGREEMENT

By and between:

COGNEX, branch of COGNEX INTERNATIONAL Inc., located at Immeuble le Patio, 104 Avenue Albert 1er at 92563 Rueil Malmaison Cedex, registered with the company registrar of Nanterre under number B385 189 469, represented by Mr. Eric Ceyrolle, dully authorized to represent the company,

Hereinafter referred to as "the Company",
on the one hand,

and:    Jean Caron
22 square Molière
32200 Boulogne sur mer

Hereinafter referred to as "the Employee",
on the other hand,

THE PARTIES AGREE AS FOLLOWS:

Article 1.
The Employee is employed by the Company for an indefinite term starting March 2, 1998.

The three first months of his employment shall constitute a trial period during which either party may terminate this agreement, without notice or severance, in accordance with the applicable laws and regulations.

Article 2.
The Employee is hired as Vision Solution Engineer.

While rendering his services, the Employee shall report directly to the Commercial Director.

The Company reserves the right to reassign the Employee to other functions falling under his expertise.

The Employee hereby declares and warranties that he is not bound by any agreement with another company and that he is free to enter into this agreement as of the date hereof.

[TRANSLATION]

The Employee shall devote all his time to the Company and diligently carry out his duties.

While carrying out his duties, the Employee shall rigorously comply with all applicable legal, regulatory and administrative directives, as well as comply with the instructions he will be given.

During the entire term of this agreement, the Employee shall refrain from engaging in any professional activity that would be considered directly or indirectly competitive, similar, or complementary in nature, or engage in any business of a potential customer or supplier of the Company, without the Company express prior authorization.

Article 3.
This agreement shall be governed by the applicable rules and regulations of the Collective Bargaining Agreement "Syntec".

The Employee shall be entitled to such additional benefits as medical insurance, and paid holiday leave recognized by the Company and applicable regulations. Paid holidays may be taken in one single leave or in several separate leaves, at times determined by the Company taking into consideration the Company's needs and desires.

Article 4.
The Employee's working hours shall be determined by the Company's activity and shall reflect the organizational and supervision requirements.

The Employee shall principally perform his duties within the Company's place of business, currently located in the Paris region. Nevertheless, the duties of the Employee may require that he travel outside of Paris or abroad, in particular to visit clients, and generally may be required to perform his duties outside of the Company's place of business.

Article 5.
The Company shall pay the Employee, at the end of each month, a salary of 235,000 French Francs before taxes, in twelve monthly installments, based on 169 hours per month.

Article 6.
All business expenses incurred by the Employee on behalf of the Company, shall be reimbursement to the Employee upon presentation of receipts in accordance with applicable internal Company rules.

2

**[TRANSLATION]**

Article 7.
The Employee agrees not to use or disclose to third parties, even after termination of this agreement, without the Company prior authorization, confidential information to which he may have access during his employment.

The Employee shall also take all necessary measures to ensure that such information is not disclosed by other Company employees or staff under his supervision.

The Employee agrees to carry out his duties while observing strict confidentiality rules, and shall refrain from disclosing them. The Employee shall strictly abide by confidentiality agreements, including business secret agreements, undertaken by the Company vis-à-vis its customers, suppliers and partners.

Article 8.
The Employee agrees to promptly communicate to the Company all inventions, processes, enhancements or improvements partly or entirely conceived by the Employee, that are related to the business of the Company or any of its affiliates.

Such inventions, processes, enhancements or improvements, whether they may be registered or not, shall be the sole and exclusive property of the Company.

Article 9.
During a period of one year as of the date of termination of this agreement, for whatever reason, the Employee hereby agrees not to solicit, directly or indirectly, any employee of the Company.

Article 10.
Each party may terminate this agreement by providing three months notice, by certified mail, return receipt requested, to the other party. The Company may, at its sole discretion, waive its right to the Employee's working during the notice period, and therefore pay the Employee a severance in lieu of notice, in accordance with applicable laws and regulations.

Done in Rueil, in two originals, on [*January 28 is deleted*] March 16, 1998

|  | Read and approved |
| /S/ | /S/ |
| _____ | _____ |
| The Company | The Employee |
| Eric Ceyrolle | Jean Caron |

3

I, Mielle C. Nichols, do hereby declare as follows:

1.     I am an attorney licensed to practice law in Belgium, and of-counsel to the law firm of Seyfarth Shaw. I work at Seyfarth Shaw's Brussels, Belgium office, and am fluent in both French and English, meaning I can easily speak, read and write in both languages.

2.     The attached document is a true and accurate English translation of an employment agreement executed March 16, 1998, written in French and signed by Mr. Jean Caron and Cognex International Inc., in Rueil, France.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was signed on Wednesday, October 20, 2004 in Brussels, Belgium.

_____
Mielle C. Nichols

CONTRAT DE TRAVAIL

Entre :

    COGNEX, Succursale de la Société COGNEX INTERNATIONAL Inc, Immeuble le Patio, 104 avenue Albert 1er à 92563 Rueil Malmaison Cedex, immatriculée au Registre du Commerce des Sociétés de Nanterre sous le numéro B385 189 469, représentée par Monsieur Eric Ceyrolle, dûment habilité à cet effet,

ci-après dénommée "la Société",<br>d'une part,

    et :   Jean Caron<br>
    22 square Molière<br>
    62200 Boulogne sur mer

ci-après dénommée "le Salarié",<br>d'autre part,

IL A ETE CONVENU CE QUI SUIT :

Article 1.
Le Salarié est employé par la Société pour une durée indéterminée à compter du 2 mars 98.

Les trois premiers mois de son emploi constituent une période d'essai durant laquelle chacune des parties pourra à tout moment et sans indemnité ni préavis mettre fin au présent contrat conformément aux dispositions légales et réglementaires en vigueur.

Article 2.
Le Salarié est engagé en qualité de : Vision Solution Engineer.

Dans le cadre de ses fonctions, le Salarié reportera directement au Directeur Commercial.

La Société se réserve de réaffecter le Salarié à d'autres fonctions relevant de ses compétences.

Le Salarié déclare et garantit qu'il n'est lié à aucune autre entreprise et qu'il est libre de tout engagement à compter de la date d'effet du présent contrat.

1

Le Salarié consacrera tout son temps et exercera toute la diligence souhaitable à l'accomplissement de ses fonctions au sein de la Société.

Dans l'exécution de ses fonctions, il s'engage à se conformer scrupuleusement aux prescriptions légales, réglementaires et administratives applicables et à se conformer aux instructions qui lui seront données.

Pendant toute la durée du présent contrat, il s'interdit d'exercer toute autre activité professionnelle et de s'intéresser, directement ou indirectement à toute affaire concurrente, connexe ou complémentaire ainsi qu'à toute entreprise susceptible d'être un client ou un fournisseur de la Société sauf autorisation expresse préalable de la Société.

Article 3.
Le présent contrat sera régi par les dispositions légales et réglementaires en vigueur et par la Convention Collective Syntec.

Le Salarié bénéficiera des avantages sociaux, dont des régimes complémentaires obligatoires d'assurance maladie et de prévoyance, et des congés payés institués par la Société et la réglementation en vigueur. Ces congés peuvent être pris en une ou plusieurs fois, aux dates déterminées par la Société compte tenu des nécessités de service et des souhaits émis par le Salarié.

Article 4.
L'horaire de travail sera fonction de l'activité et correspondra aux nécessités de l'organisation du travail et de la surveillance de son exécution.

Le Salarié exercera ses fonctions à titre principal dans les locaux de la Société, actuellement situés dans la région parisienne. Cependant, les fonctions du Salarié pourront l'amener à effectuer des déplacements en province et à l'étranger, particulièrement chez les clients et, d'une manière plus générale, en dehors des locaux de la Société

Article 5.
La Société versera au Salarié en rémunération de ses fonctions un salaire forfaitaire annuel brut de 235 000 FF payable en douze mensualités égales, sur la base de 169h/mois, à terme échu.

Article 6.
Tous les frais professionnels du Salarié, exposés dans l'intérêt de la Société, lui seront remboursés intégralement sur présentation de justificatifs conformément aux procédures internes en vigueur dans la Société.

Article 7.

Le Salarié s'engage à ne pas utiliser ou divulguer à des tiers, sans autorisation expresse préalable, même après la cessation du présent contrat de travail, les informations confidentielles auxquelles il aurait accès dans le cadre de ses fonctions.

Il fera en outre le nécessaire pour prévenir la divulgation de telles informations par les employés ou préposés de la Société se trouvant sous sa responsabilité.

Il s'engage à respecter la plus stricte confidentialité dans l'exécution des tâches qui lui seront confiées, et dont il s'interdit de révéler l'existence ou la teneur. Il respectera scrupuleusement les engagements de confidentialité et, le cas échéant, de secret professionnel pris par la Société notamment vis à vis de ses clients, fournisseurs et partenaires.

Article 8.

Le Salarié s'engage à communiquer promptement à la Société les découvertes, inventions, procédés, améliorations ou modifications dont il est l'auteur ou auxquels il a concouru et ayant trait aux activités de la Société ou de toute autre Société affiliée à celle-ci.

Les dits découvertes, inventions, procédés, améliorations ou modifications, brevetables ou non, seront la propriété exclusive de la Société.

Article 9.

Pendant un délai d'un an à compter de la date de cessation du présent contrat, pour quelque cause que ce soit, le Salarié s'interdira, directement ou indirectement, de débaucher tout employé de la Société.

Article 10.

Chacune des parties pourra à tout moment mettre fin au présent contrat moyennant un préavis de trois mois, notifié à l'autre partie par lettre recommandée avec demande d'avis de réception. La Société se réserve le droit, à sa seule discrétion, de dispenser le Salarié de l'exécution de son préavis, qui sera en ce cas remplacé par l'indemnité compensatrice prévue par les dispositions légales et réglementaires applicables

Fait à Rueil, en double exemplaire, le ~~23 février~~ *16 mars* 98

*lu et approuvé.*

_____          _____
        la Société,                              le Salarié,
       Éric Ceyrolle                            Jean Caron

3