**Exhibit B**

# COGNEX

Vision for Industry®

## EMPLOYEE INVENTION, NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

AGREEMENT entered into this _16_ day of _MARS_____, 199_6_, by and between Cognex Corporation, a Massachusetts corporation with a principal place of business at One Vision Drive, Natick, Massachusetts 01760-2059 and any of its affiliates, subsidiaries, successors and assigns as presently constituted and as may be established in the future (the "Company") and _Yca_ CARON_____, the undersigned employee of the Company (the "Employee").

IN CONSIDERATION OF the hiring of the Employee by the Company and for the wages and other benefits provided to the Employee by the Company during the Employee's period of employment with the Company, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Employee, the Employee hereby agrees with the Company as follows:

1.  Invention and Discoveries

"Inventions and Discoveries" are herein defined as all inventions, discoveries, enhancements, ideas and improvements (whether or not patentable) and all writings, compilations, programs, documentation and reports related thereto (whether or not copyrightable) made, conceived, devised, discovered or prepared by the Employee, including the work product resulting from any project undertaken by him or her, whether solely or jointly with others, at any time, whether during or after regular working hours, while he or she remains in the employ of the Company, and for a period of six (6) months thereafter, and which relate in any manner to the actual or anticipated business of the Company or the actual or anticipated research and development of the Company or are suggested by or result from any of the work performed by the Employee for or on behalf of the Company. Inventions and Discoveries are, and shall be and remain, the sole and exclusive property of the Company, and the Employee hereby assigns to the Company and agrees to assign to the Company his or her entire right, title and interest in the Inventions and Discoveries. The Employee hereby grants to the Company a non-exclusive, unlimited, irrevocable and fully paid, royalty free license, without additional compensation, of the Employee's rights to any invention, improvement or enhancement made, conceived, devised or discovered by the Employee prior to the Employee's employment by the Company and incorporated by the Employee in any work product produced by the Employee during the Employee's employment with the Company.

Inventions and Discoveries shall not include those inventions, discoveries, enhancements, or ideas made by the Employee during non-business hours except for those which: a) relate in any manner to the actual or anticipated business of the Company or the actual or anticipated research and development of the Company, or b) result from any of the work performed by the Employee for or on behalf of the Company, or c) were made by the Employee with the use of Company facilities, equipment, supplies, or trade secrets.

2.  Disclosure of Inventions and Discoveries

The Employee agrees promptly to disclose the Inventions and Discoveries to the President of the Company or to whomever else may be designated by the President, and to execute a specific assignment thereof to the Company. The Employee further agrees to assist the Company in any reasonable manner to obtain for its own benefit patents or copyrights thereon in any and all countries, and to execute when requested patent or copyright applications and assignments thereof to the Company and any other documents deemed necessary by the Company to carry out the purposes of this Agreement, all without further consideration, but at the expense of the Company. The Employee agrees that the obligations and undertakings stated in this section shall continue beyond the termination of his or her employment with the Company indefinitely (regardless of the reason for such termination), but if he or she shall be called upon to

render such assistance after the termination of his or her employment, he or she shall be entitled to a fair and reasonable fee in addition to reimbursement for any expenses incurred at the request of the Company. The disclosure requirements of this Section 2 shall also apply to any inventions, discoveries, enhancements, ideas and improvements and all writings, compilations, programs, documentation and reports related thereto made, conceived, devised, discovered or prepared by the Employee after the termination of the Employee's employment with the Company which in any way arise from or are based upon any proprietary information, trade secret or other intellectual property belonging to the Company or for which the Company possesses a license.

3.    Proprietary Information

The Employee hereby acknowledges that the techniques, formulas, programs, processes, designs and business and marketing methods used and to be used by the Company are of a confidential and secret character, of great value and proprietary to the Company. The Company shall give or continue to give the Employee access to the foregoing categories of confidential and secret information and the trade secrets of its customers (collectively, "Proprietary Information"), so long as he or she remains in the employ of the Company, and permit him or her to work thereon and become familiar therewith to whatever extent the Company in its sole discretion determines. The Employee agrees that without the prior written consent of the Company he or she shall not, during his or her employment with the Company or at any time thereafter, divulge to anyone or use to his or her benefit any Proprietary Information, unless such Proprietary Information shall be in the public domain in a reasonably integrated form through no fault of the Employee. The Employee further agrees to take all reasonable precautions to protect from loss or disclosure all documents supplied to him or her by the Company and all documents, notebooks, materials and other data relating to any work, research and experiments conducted by him or her or others relating to the Proprietary Information, and upon termination for whatever reason of his or her employment to deliver these documents, notebooks, materials and data forthwith to the Company.

4.    Covenant Not to Compete

4.1    The Employee hereby covenants and agrees that during his or her employment with the Company and for the period of time defined below following termination of his or her employment with the Company, whether voluntary or involuntary and whether with or without cause, he or she will not, without the prior written consent of the President of the Company, directly or indirectly, for himself or herself, or on behalf of any other person or entity:

4.1.1    Through the use of the Proprietary Information or any trade secret of the Company or by any other means, solicit any business relating to any business then conducted by the Company from any customer or client of the Company who was such at any time during the twelve (12) month period immediately preceding such termination, or was actively solicited to become such during said twelve (12) month period, all as verified by the books and records of the Company; or

4.1.2    Cause or encourage anyone or any entity, through the use of the Proprietary Information or any trade secret of the Company or by any other means, to solicit any such business from any of said customers, clients or prospective customers and clients; or

4.1.3    Disclose to anyone or any entity the names or addresses of any of said customers and clients or prospective customers and clients, nor cause any such disclosure, unless such information shall be in the public domain through no fault of the Employee; or

4.1.4    Request or cause any of said customers, clients or prospective customers and clients to cancel or terminate or refuse to enter into any business relationship with the Company; or

4.1.5    Call upon any persons who are employees or consultants of the Company for the purpose of diverting or taking them away from their employment or consultancy with the Company; or

4.1.6    Engage as an owner, stockholder, manager, agent, consultant, director or employee in any business competitive with or similar to any business which has been conducted by the Company at any time during the term of his or her employment with the Company; provided that the provisions of this Subsection 4.1.6 shall not be deemed breached by the aggregate ownership by the Employee, as the result of open market purchases, of one (1%) percent or less of the capital stock of a corporation, the stock of which is regularly traded on a stock exchange or in the over-the-counter market. The Employee agrees that the granting of stock options to the Employee by the Company ("Employee's Stock Options") and any pre-tax gains realized as a result of the exercise of any portion of such options plus any gains realized as a result of the sale of any shares acquired through the exercise of any portion of such options shall be further consideration to the Employee for the Employee's compliance with the terms of this Subsection 4.1.6. Companies listed in Exhibit 1 are known to be competitors of Cognex as of the date of this Agreement; The list set forth in Exhibit 1 is not comprehensive, and, therefore, the absence of any particular company from this list does not indicate that the particular company is not a competitor of Cognex.

4.2    The duration of the obligations of the Employee under this Section 4 ("Non-Compete Period") shall commence upon the first day of his or her employment by the Company and shall continue for a period of two years following termination of his or her employment with the Company, provided, however, that if the term of such employment was less than two years, the obligations of the Employee under this Section 4 shall continue for the greater of six months or such term; and shall extend throughout the United States of America and any foreign country in which the Company engaged in business during the term of his or her employment with the Company or in which business was actively contemplated by the Company at the time of the termination of such employment. In the event of any violation of any provision of this Agreement, the Non-Compete Period shall be extended for a period of time equal to the period of time which the Employee is in violation.

5.    <u>Employee's Representation and Warranties</u>

The Employee hereby represents and warrants to the Company that:

5.1    prior to his or her employment by the Company, he or she had no detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems other than as may be described in writing and attached hereto as Exhibit 2; and

5.2    he or she is not a party to or in any way bound by any prior agreement whether with a prior employer or otherwise, which could in any way prohibit him or her from becoming an employee of the Company or from carrying out his or her obligations under this Agreement, including specifically, but without limitation to, his or her obligations under Sections 1 and 2 of this Agreement; and

5.3    he or she will not disclose to any employee or representative of the Company information of any former employer or client which is of a confidential nature.

6.    Remedy for Breach

6.1    The Employee expressly recognizes that this Agreement is necessary to protect the legitimate business interests of the Company and that any breach of this Agreement by the Employee is likely to result in irreparable injury to the Company. The Employee agrees that the Company shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement; to enforce the specific performance of this Agreement by the Employee; and to enjoin the Employee from activities in violation of this Agreement without the necessity of Cognex proving any damage to the Company. Further, the Company reserves any and all rights and remedies which may be available at law, in equity or otherwise, whether based upon common law, statute or other source of law, with respect to any breach or violation of this Agreement.

6.2    In the event a court of competent jurisdiction determines that the Employee has violated Section 4.1, Subsection 4.1.6 of this Agreement, then the Employee agrees to pay to the Company additional damages in an amount equal to the total of all pre-tax gains realized by the Employee as a result of the exercise by him or her of any portion of the Employee's Stock Options plus any gains realized as a result of the sale of any shares acquired through the exercise of any portion of such options.

7.    Voluntary Execution

The Employee specifically acknowledges that he or she has read, carefully considered, and understands this Agreement, that each of the terms and conditions of this Agreement are fair and reasonable, that he or she executes this Agreement voluntarily, and that this Agreement is not the product of fraud, duress or coercion. The Employee acknowledges that he or she has not executed this Agreement in reliance upon any promises, representations, warranties, or statements not incorporated by reference into the Agreement. Further, the Employee agrees that this Agreement was fairly and fully bargained for in good faith prior to commencing employment with the Company, and that the terms and conditions of this Agreement, including those covenants in Section 4, do not constitute any impairment of the Employee's ability to pursue a livelihood during the Non-Compete Period. To the extent that the terms and conditions of this Agreement, including those covenants in Section 4, constitute an impairment of the Employee's ability to work within his or her field of expertise during the Non-Compete Period, the Employee hereby agrees that this Agreement provides fair and adequate consideration for any such impairment.

8.    Entire Agreement; Modification

This Agreement contains the entire understanding and agreement between the parties hereto with respect to the matters referred to in this Agreement. This Agreement may be altered, amended or superseded only by an agreement in writing, signed by both parties or the party against whom enforcement of any waiver, change, modification, extension or discharge is sought. No action or course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms and conditions of this Agreement, or of such terms and conditions on any other occasion.

9.    Severability

The Employee and Cognex hereby expressly agree that the provisions of this Agreement are severable and, in the event that any court of competent jurisdiction shall determine that any provision or covenant herein contained is invalid, or overly broad or unreasonable under applicable law, in whole or in part, the court is hereby requested and authorized by the parties hereto to revise said provision or covenant so as to provide the maximum benefit allowed by law to Cognex, and that the remaining provisions or covenant shall remain unchanged and enforceable. In the event that the court determines that Section 4 of this Agreement would be enforceable except for reason of lack of adequate consideration herein, then the court

is further hereby requested to determine such additional consideration such that, if paid by the Company to the Employee, the court would find Section 4 binding and enforceable upon the Employee. The Company shall then have the sole right to pay such additional consideration to the Employee, and failing such payment, the Company shall then abide by the court's determination.

10.    Binding Effect; Benefit

This Agreement shall be binding upon the Employee, without regard to the duration of his or her employment by the Company or the reasons for the cessation of such employment, which cessation may be voluntary or involuntary, and which may be with or without cause. This Agreement shall also be binding upon the Employee's administrators, executors, heirs, and assigns, and shall inure to the benefit of the Company.

11.    Executed Copy

One original signed copy of this Agreement shall be executed and maintained on file by the Company. The Employee shall receive a copy of the signed original which shall be considered and have the force and effect of the original.

12.    Governing Law

The validity, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts excluding said state's choice of law rules. The parties hereto voluntarily submit themselves to the jurisdiction of the Courts of the Commonwealth of Massachusetts with respect to any action to remedy any breach or to otherwise enforce the terms and conditions of this Agreement.

13.    Effective Date

This Agreement shall be deemed effective as of the first date of employment of the Employee by the Company. In the event this Agreement is executed by the Employee at a date following the first date of employment of the Employee by the Company, the Employee represents that he or she has complied with all of the terms herein during the period commencing upon his or her employment by the Company to the date first written above.

The above is hereby agreed and accepted:

Employee: _____        Cognex Corporation:
          (Employee Signature)

          JEAN CARON                        By:_____
          (Printed Name)                       (Authorized Company Signature)

Address:  22 square Molière.

          92200 Boulogne/Bn, FRANCE

I, _Valérie Ryder_, hereby attest to the witnessing of the above Employee signature on this 16 day of March, 199 8: (x)_Valérie Ryder_.

Exhibit 1

Companies listed below in this Exhibit 1 are known to be competitors of Cognex as of the date of this Agreement. The list set forth in this Exhibit 1 is not comprehensive, and, therefore, the absence of any particular company from this list does not indicate that said company is not a competitor of Cognex.

Cognex & Acumen Product Competitors:

Adept
AISI
Allen Bradley
Ball Corp.
Bar Gold
Basler
Coreco
CR Technology
CRS (Computer Recognition Systems)
CyberOptics
Datacube
Data Translation
Dickerson
ESI (including: Intellidex and XRL)
Fast
ICOS
Imaging Technology (including: Intelec)
Imputer
Integral Vision Ltd. (subsidiary of Medar)
Keyence
KLA
Label Vision
Matrox
Matsushita
MTI (Mathematical Technologies)
Mneumonics
National Instruments
Noesis
Omron
Optimas
Philips Electronics
PPT
Qtec
Rheinmetall
RVSI (including: Acuity/Itran/ID Matrix)
Sharp
Videk
View Engineering
Xiris

Isys Product Competitors:

ABB, Ulma Division
Dr. Schenk, GMBH
EES, Ltd.
Focus Automation
Futec
Intec
Mayan Automation
Measurex, Roibox division
Sira
Sipar
Systronics
Toshiba
Veritas

The information set forth in this Exhibit 1 is agreed to and understood by:

Employee: ‾‾J͡ C‾‾‾‾‾‾
　　　　　(Please initial)

Company:‾‾‾‾‾‾‾‾‾‾‾
　　　　　(Please initial)

Exhibit 2

Description of the Employee's prior detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems:

I worked with the Université de Lille and the Université du littoral  in a Vision Laboratory from 1992 to 1998

I have developped some industrial vision applications :

- Installation of an Automated Online inspection system by VME machine and line scan camera at the Fabrique de Fer de Maubeuge in Maubeuge plant (France) to inspect sheet iron

- Development and installation of an Automated Online inspection system by PC and line scan camera at the Union Minière in the Viviez plant (France) to inspect zinc.

- Development and installation of  a vision based system by PC to inspect offline and online plastic film at S.A. Guial in Villefranche sur Saône plant(France).

- I worked as an Engineer in S.A. Bernhardt based in Boulogne sur Mer (France) from 01/1996 until 03/13/1998.
  I developed and installed an Automatic Online Visual Inspection for plastic strip based on line scan camera.

The information set forth in this Exhibit 2 is agreed to and understood by:

Employee: ___JC___         Company:_____
    (Please initial)               (Please initial)

**Exhibit C**

# [TRANSLATION]

## AMENDMENT TO EMPLOYMENT AGREEMENT

By and between:

COGNEX, branch of COGNEX INTERNATIONAL Inc., located at Immeuble le Patio, 104 Avenue Albert 1er at 92563 Rueil Malmaison Cedex, registered with the company registrar of Nanterre under number B385 189 469, represented by Mr. Eric Ceyrolle, dully authorized to represent the company,

Hereinafter referred to as "the Company",<br>on the one hand,

and:

JEAN CARON
Apt. A67 – 10-26, Boulevard Herold
92000 Nanterre

Hereinafter referred to as "the Employee",<br>on the other hand,

THE PARTIES AGREE AS FOLLOWS:

Article 1.
This amendment to the employment agreement shall become effective on January 1, 2002, in accordance with the "Syntec" national Agreement of June 22, 1999, on working hours.

Article 2.
Pursuant to the collective bargaining rules on the classification of Engineers and Excutives (Annex 2 and Amendment #20 of November 27, 1997 of the National Collective Bargaining Agreement "Syntec"), the Employee's position is as follows: Position 2.2, hierarchic grade 130.

Article 3.
Considering this position, the duties and responsibilities conferred upon the Employee, the provisions set forth in Article 3, Chapter 2 of the national "Syntec" Agreement of June 22, 1999, relating to the carrying out of duties, hereby applies.

The rules set out a total 219 days a year, with possible adjustments, for carrying out such duties. The average work week per year is 38.5 hours, i.e., 35 hours with a maximum 10% surplus.

For 2002, the decrease of number of effective work days shall generate 10 additional days on which the Company shall be closed:

| | |
|---|---|
| January 2 | August 16 |
| March 29 | December 23 |
| May 2 | December 24 |
| May 3 | December 26 |
| May 10 | December 27 |

**[TRANSLATION]**

These 10 non-working days include: 8 days to reach the new annual threshold of 219 days + 2 additional days (i.e., 4 half-days of recovery, suggesting 4 weeks of possible excesses within an average work week of 38.5 hours per year).

In December each year, the Company shall advise the Employee how the work time shall be adjusted for the following year.

Article 4.

This amendment is considered an integral part of the Employee's employment agreement signed at the time he was hired and therefore amends only the section referring to his work time.

Done in Rueil, in two originals, on _____12/20/2001_____

/S/                                                      /S/
_____                    _____
The Company                                        The Employee
Eric Ceyrolle                                          Jean Caron

I, Mielle C. Nichols, do hereby declare as follows:

1.    I am an attorney licensed to practice law in Belgium, and of-counsel to the law firm of Seyfarth Shaw. I work at Seyfarth Shaw's Brussels, Belgium office, and am fluent in both French and English, meaning I can easily speak, read and write in both languages.

2.    The attached document is a true and accurate English translation of an amendment to an employment agreement, executed December 20, 2001, written in French and signed by Mr. Jean Caron and Cognex International Inc., in Rueil, France.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was signed on Wednesday, October 20, 2004 in Brussels, Belgium.

_____
Mielle C. Nichols

## AVENANT AU CONTRAT DE TRAVAIL

Entre :

COGNEX, Succursale de la Société COGNEX INTERNATIONAL Inc, Immeuble le Patio, 104 avenue Albert 1er, 92563 Rueil Malmaison Cedex, immatriculée au Registre du Commerce des Sociétés de Nanterre sous le numéro B385 189 469, représentée par Monsieur Eric Ceyrolle, dûment habilité à cet effet,

ci-après dénommée "la Société",
d'une part,

et :

JEAN CARON
Appt. A67 - 10-26, boulevard Herold
92000 Nanterre

ci-après dénommé "le Salarié",
d'autre part,

IL A ETE CONVENU CE QUI SUIT :

Article 1.
Le présent avenant au contrat de travail entre en vigueur le 1er janvier 2002, en application de l'Accord national Syntec du 22 juin 1999 sur la durée du travail.

Article 2.
Suite à l'application des dispositions conventionnelles concernant la classification des Ingénieurs et Cadres (Annexe 2 et Avenant N° 20 du 27 novembre 1997 de la Convention Collective Nationale Syntec), la position du Salarié est définie comme suit : Position 2.2, correspondant au coefficient hiérarchique de 130.

Article 3.
Compte tenu de la position, de la nature de la fonction et des responsabilités qui sont attribuées au Salarié, les dispositions de l'Article 3 du Chapitre 2 de l'Accord national Syntec du 22 juin 1999, correspondant aux modalités de réalisation de missions, s'appliquent.

Les modalités de réalisation de missions prévoient un temps de travail fixé avec modulation sur l'année de 219 jours par an au total. Le temps de travail hebdomadaire moyen sur l'année est fixé à 38H30, soit 35H plus un dépassement maximal de 10%.

Pour l'année 2002 la réduction du nombre de jours de travail effectifs se traduit par la fermeture de la Société les 10 jours suivants :

| | |
|---|---|
| 02 janvier | 16 août |
| 29 mars | 23 décembre |
| 02 mai | 24 décembre |
| 03 mai | 26 décembre |
| 10 mai | 27 décembre |

1

Ces 10 jours de fermeture correspondent à : 8 jours pour atteindre le nouveau seuil annuel de 219 jours, + 2 jours supplémentaires (soit 4 demi-journées de récupération, résultant de 4 semaines de dépassement éventuel par an du temps de travail hebdomadaire moyen de 38H30).

Chaque année au mois de décembre, la Société communiquera au Salarié les modalités d'aménagement du temps de travail pour l'année suivante.

Article 4.

Le présent avenant fait partie intégrante du contrat de travail signé par le Salarié lors de son embauche et ne modifie que la clause concernant l'horaire de travail.

Fait à Rueil, en double exemplaire, le 20/12/2001.

la Société,
ÉRIC CEYROLLE

le Salarié,
JEAN CARON

2

**Exhibit D**

# COGNEX

## Performance Planning & Review Form

JEAN CARON
Name

SENIOR VISION SOLUTION ENGINEER
Position

ALAIN DUFLOT
Manager

## 1. Performance Plan
(Core responsibilities, project goals, development activities. Be specific, include measurement criteria and completion dates).

| | DUE DATE |
|---|---|

ACHIEVE THE THE VISION SOLUTION PROJECTS PUT ON HIS CHARGE

- SYSTEL PROJECT COMPLETED BEGINNING OF 2001 YEAR ON TIME  (80K$ VS PROJECT)
- PHILIPS            OMI& VC++
- CERI               OMI&VB
- SAGEM              DIP
- TEST INNOVATION    OMI&VC
- FCI                IS FAST TRACK
- DELPHI             DATA MATRIX VS
- NCS                IS FAST TRACK
- MAHLE              IS FAST TRACK
- APS                IS FAST TRACK
- FEDERAL MOGUL      IS FAST TRACK
- COSC               IS FAST TRACK

ALL THIS PROJECTS HAS BEEN REALISED WITH THE TOTAL CUSTOMER SATISFACTION AND MOST OFTEN, RESULT OF THESE ACTION WERE SOME ADDITIONAL ORDER FROM CUSTOMERS.

DATA MATRIX IMPROVEMENT FOR INDUSTRIE AUTOMATION. JEAN HAS DEVELOPPED A DECODING ALGORITHM TO READ CODES THAT STANDARD COGNEX TOOLS WERE NOT ABLE TO DECODE. BY THIS ACTION, HE SATISFIED CUSTOMERS (PEUGEOT&RENAULT) REGARDING THE GOOD RESULT OBTAINED ON PRODUCTION LINE.

MITSUBISHI FOLLOW-UP: THIS YEAR, MITSUBISHI STARTED THEIR PRODUCTION OF COLOR DISPLAY MOBILE PHONE. JEAN WAS IN CHARGE TO FOLLOW THE CUSTOMER BY SETTING THE FIRST 17 COLOR DIP PRODUCT IN EUROPE. HE WORK WITH A HIGH COLLABORATION WITH KARLSRHE ENGINEERING AND HAS DONE CONTINUOUS REPORTING ON THE CUSTOMER FEEDBACK TO ENGINEERING, IN SUCH A WAY THAT DIP BECAME A PRODUCT ADAPTED TO CUSTOMER NEEDS.

EVOLUTION IN TAKING IN CHARGE VISION SOLUTION PROJECTS: JEAN WAS AUTONOMOUS ON ALL PROJECT HE WERE IN CHARGE. HE HAS ALSO WRITTEN SOME VISION SOLUTION PROPOSAL SUCH AS ARC (DROP INSPECTION), LA POSTE (CODE READER), ABB SPAIN (ROBOTIC), DELPHI (DATA MATRIX READER).

PRESALES ACTION. JEAN WAS PUT THIS YEAR ON SOME PRESALES ACTION WHEN SOME HIGH TECHNICAL LEVEL WERE REQUIRED.

| date | Mgr. Initials | Employee Initials |
|---|---|---|

Performance Planning & Review Form - 2/96

4. PERFORMANCE FACTOR GUIDELINES

1. JOB KNOWLEDGE/TECHNICAL COMPETENCE: Demonstrates depth of understanding or job content & field of specialization. Understands the work environment, job requirements & customer needs.

**Outstanding Contributor**

2. QUALITY OF WORK: Demonstrates a commitment to quality of work output. Thoroughly & accurately completes assignments. Takes corrective action when required.

**Outstanding Contributor**

3. TEAMWORK/FLEXIBILITY: Establishes & maintains cooperative & productive relationships. Responds actively & sensitively to the needs of internal & external customers. Shares ideas and responds positively to changes.

**Outstanding Contributor**
JEAN NEVER HESITATED TO CHANGE THE ORIGINAL SCHEDULE PLANNED TO GO ON SITE AS SOON AS IT IS REQUIRED BY CUSTOMER. HE ALWAYS DEMONSTRATED A HIGH COMMITMENT TO THE COMPANY BY ADAPTING HIS PERSONAL TIME TO ANY REQUEST UNTIL CUSTOMER SATISFACTION IS REACHED.
THIS YEAR, JEAN ALSO SUCCESSFULLY STARTED TO FOLLOW SOME VISION SOLUTION HANDLE BY OTHER PERSON OF THE CS TEAM;

4. INNOVATION/INITIATIVE: Ability to organize & develop creative ideas. Originates ideas or methods to improve customer satisfaction or complete assignments.

**Excellent Contributor**
JEAN HAS DEVELOPPED A NEW METHOD OF DECODING DATA MATRIX, TO IMPROVE THE EXISTING ALGORITHM AT COGNEX. HE DEMONSTRATED BY THIS WAY A HIGH CAPABILITY TO DEVELOP CREATIVE IDEA.

5. COMMITMENT/ATTITUDE: Openly supports company and group goals and demonstrates commitment to our culture. Is enthusiastic toward job, work environment, management and customers.

**Excellent Contributor**

6. COMMUNICATION/INTERPERSONAL SKILLS: Communicates clearly & convincingly using oral, written and/or presentation skills. Listens effectively to others; values and respects differences. Uses tact & diplomacy to resolve conflicts.

Excellent Contributor

7. PLANNING/ORGANIZING. Ability to anticipate needs, plan, schedule and prioritize tasks and assignments efficiently to maintain a high level of quality output and customer satisfaction.

Excellent Contributor

8. PRODUCTIVITY/DEPENDABILITY: Uses resources efficiently and effectively to juggle multiple tasks simultaneously to meet customers' needs.

Excellent Contributor

9. PROBLEM ANALYSIS/DECISION-MAKING: Researches & evaluates issues thoroughly and objectively; uses innovative approaches to problem-solving. Implements timely decisions which result in improved customer satisfaction.

Excellent Contributor

10. PROJECT LEADERSHIP: Ability to plan, schedule, coordinate and monitor tasks of the project team to produce a high level of quality output.

Valued Contributor
JEAN STARTED THIS YEAR TO FOLLOW SOME INSIGHT REMOTE FAST TRACK THAT WAS REALISED BY OTHER PERSONS IN THE TEAM. HE SHOWED A GOOD CAPABILITY TO HANDLE A VS PROJECT THAT IS REALISED BY SOMEBODY ELSE.

5.    THIS SECTION TO BE COMPLETED FOR ALL MANAGERS AND ABOVE:

11. STAFFING: Ability to attract, select and retain qualified employees in the group/department.    Appropriately matches employees' skills/abilities to position/project requirements.

12. PERFORMANCE MANAGEMENT: Performance plans are jointly developed with each employee. Provides timely, constructive feedback and encourages feedback from others. Recognizes and rewards work well done. Effectively coaches employees requiring performance improvement and documents discussions.

13. EMPLOYEE DEVELOPMENT: Challenges employees to their full potential. Provides for adequate training or employees to perform effectively in current position and/or achieve career objectives. Allows time for discussion of career goals with employees.

14. COMMUNICATIONS: Information is shared openly with group/department members.    Group/department goals are clearly communicated to all members. Suggestions from employees are encouraged and considered.

15. LEADERSHIP: Motivates employees to produce a high level of quality output. Generates enthusiasm. Empowers employees to make decisions providing support when necessary. Promotes cooperation and teamwork. Exemplifies the basic corporate beliefs; commitment to our customers, respect for the individual; and commitment to excellence.

16. DELEGATION: Delegates meaningful assignments, follows-up, provides support and holds employees accountable for results.

17. FINANCIAL: Develops and/or recommends the budget required to support the department. Manages department expenses to budget.

Performance Planning & Review Form - 2/96

6.  MANAGER'S COMMENTS:

DURING ALL THIS YEAR, JEAN HAS DEMONSTRATED ALL HIS TECHNICAL COMPETENCIES BY COMPLETING SOME HUGE AND VERY CHALLENGING PROJECTS AND ALWAYS SATISFIED THE CUSTOMER. JEAN IS RECOGNIZED INTERNALLY AND EXTERNALLY AS A HIGH LEVEL TECHNICAL EXPERT. HIS ATTITUDE WITH THE CUSTOMER HAS ALWAYS BEEN RECOGNIZED BY CUSTOMERS, AND WE ALWAYS RECEIVED GOOD FEEDBACK FROM THEM REGARDING JEAN'S COMMITMENT TO THEIR NEEDS.
JEAN ALWAYS DEMONSTRATES ALL HIS COMMITMENT BY TAKING THE REQUIRED ACTIONS TO SATISFY THE CUSTOMER REQUIREMENT, AND ALWAYS PUT IT BEFORE ANY OTHER ITEM.
JEAN WAS AUTONOMOUS ON ALL PROJECTS HE WAS IN CHARGE AND HE STARTED THIS YEAR TO FOLLOW SOME VISION SOLUTION PROJECT DONE BY OTHER PERSONS AND DEMONSTRATED A GOOD POTENTIAL FOR THIS.

KEY STRENGTHS and SUGGESTED IMPROVEMENTS:

| Key Strengths | Suggested Improvements * |
|---|---|
| JOB KNOWLEDGE/TECHNICAL COMPETENCE | COMMUNICATION AND REPORTING |
| QUALITY OF WORK | |
| TEAMWORK/FLEXIBILITY | |
| PROBLEM ANALYSIS/DECISION-MAKING | |

* NOTE: Please complete section below to capture a training plan for suggested improvements.

TRAINING RECOMMENDED TO INCREASE EFFECTIVENESS ON THE JOB:

ENGLISH LANGUAGE.
PROJECT MANAGEMENT

Performance Planning & Review Form - 2/96

7. OVERALL PERFORMANCE RATING:

_____ Outstanding Contributor: consistently and significantly exceeds goals and expectations.

__XX__ Excellent Contributor: frequently exceeds goals and expectations.

_____ Valued Contributor: meets and sometimes exceeds goals and expectations.

_____ Marginal Contributor: occasionally meets goals and expectations.    A performance improvement plan is required.

_____ Fails to Meet Requirements:  A corrective action plan must be implemented as soon as possible.

EMPLOYEE COMMENTS:

I have read this appraisal of my recent job performance and discussed it with my manager.  By signing this appraisal, I am not necessarily indicating
my agreement with its contents.  I am, however, verifying that an appraisal was written and discussed.

Manager _____DUFLOT_____    Date ____22-01-2002____

Next Level Manager ____LACROIX_____    Date ____22-01-2002____

Employee ____CARON_____    Date ____22-01-2002____

Human Resources _____    Date _____

Performance Planning & Review Form - 2/96

**Exhibit E**

**[TRANSLATION]**

Nanterre, June 16, 2003

Jean Caron
A67
10/26 bd Hérold
92000 Nanterre

Mr. Lacroix
Southern Europe Sales Director
Cognex International
Immeuble Le patio
104 Avenue Albert 1er
92563 Rueil-Malmaison cedex

Dear Sir:

I hereby inform you of my decision to resign from the position I hold within the company.

Sincerely,
Jean Caron

/S/

I, Mielle C. Nichols, do hereby declare as follows:

     1.     I am an attorney licensed to practice law in Belgium, and of-counsel to the law firm of Seyfarth Shaw. I work at Seyfarth Shaw's Brussels, Belgium office, and am fluent in both French and English, meaning I can easily speak, read and write in both languages.

     2.     The attached document is a true and accurate English translation of a letter dated June 16, 2003, addressed to Mr. Lacroix of Cognex International, written in French and signed by Mr. Jean Caron, in Nanterre, France.

     I declare under penalty of perjury that the foregoing is true and correct and that this declaration was signed on Wednesday, October 20, 2004 in Brussels, Belgium.

_____
Mielle C. Nichols

Jean Caron
A67
10/26 bd Hérold
92000 Nanterre

Nanterre, le 16 juin 2003

Monsieur Lacroix
Directeur des ventes Europe du sud,
Cognex International,
Immeuble Le Patio,
104 Avenue Albert 1er,
92563 Rueil-Malmaison cedex

Monsieur.

Je vous informe par la présente de ma décision de démissionner du poste que j'occupe dans l'entreprise.

Veuillez agréer, Monsieur le Directeur, mes salutations distinguées.
Jean Caron