UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COGNEX CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04 12365 JLT |
| | ) | |
| JEAN CARON, | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION, FORUM NON CONVENIENS, OR IMPROPER SERVICE**

<u>Introduction</u>

Plaintiff, Cognex Corporation ["Cognex"], opposes Defendant, Jean Caron's ["Caron"], motion to dismiss this action because:  (1) this Court has personal jurisdiction over Caron based solely on his express, written jurisdictional waiver in the parties' March 1998 restrictive covenant agreement; (2) this Court has personal jurisdiction over Caron under M.G.L. c. 223A and the Due Process Clause of the Constitution; (3) this forum is convenient; and (4) Caron was properly served.

<u>Statement of Relevant Facts</u>

Caron commenced employment in March 1998 with Cognex International ["CI"], a wholly-owned subsidiary of Cognex, as a Vision Solutions Engineer in Cognex's Vision Solutions Group.  (Affidavit of Didier Lacroix, ¶¶ 6, 7 ["Lacroix Aff. ¶ __"].)[1]  His responsibilities included developing custom machine vision software for discrete and complicated customer applications.  (Lacroix Aff. ¶ 9.)

Prior to his employment with CI, Caron signed a 3-page employment agreement written in French and governed by French law [the "French Agreement"].  (Lacroix Aff. ¶ 13.)  This agreement contains information on the terms of Caron's employment, as well as certain covenants protecting CI's proprietary information and employees.  (<u>Id.</u>)  Also prior to his employment (and like all employees of Cognex and its subsidiaries), Caron signed a 6-page agreement in English, entitled "Employee Invention, Non-Disclosure and Non-Competition Agreement" [the "English Agreement"].[2]  (Affidavit of Valerie Ryder, ¶¶ 3, 5-7.)

The English Agreement contained, <u>inter alia</u>, a provision preventing Caron from working for a direct Cognex competitor for the two (2) years following the termination of his employment

---

[1] All Affidavit references herein shall be cited in a similar format.
[2] A true and accurate copy of the English Agreement is attached to the Complaint in this action as Exhibit A.

with Cognex, or any of its subsidiaries.  (Lacroix Aff. ¶ 5; Complaint, Ex. A.)  The English

Agreement also provided that Massachusetts law governed it and that "*the parties hereto*

*voluntarily submit themselves to the jurisdiction of the Courts of the Commonwealth of*

*Massachusetts with respect to any action to remedy any breach or to otherwise enforce the terms*

*and conditions of [the] Agreement*."[3]  (Complaint, Ex. A.)

Caron signed the English Agreement on or about March 16, 1998, the first day of his

employment.  (Ryder Aff. ¶ 5.)  Caron was given an opportunity to review the English

Agreement and ask any questions of CI's Human Resource representative who witnessed

Caron's execution of the English Agreement.  (Ryder Aff. ¶¶ 8, 9, 12.)  He was never told by

anyone that the English Agreement was a translation of the French Agreement.  (Ryder Aff. ¶¶ 6,

12; Affidavit of Alain Duflot, ¶ 5.)  Caron clearly was aware that the English Agreement differed

from the French Agreement, because it had 3 additional pages and 2 exhibits.  Further, unlike the

French Agreement, the English Agreement required Caron to attach an exhibit identifying his

prior machine vision systems experience, which he did.  (Ryder Aff. ¶ 6, 7; Complaint, Ex. A.)

Caron could determine that the two agreements differed as he could read and write

English well.  (Ryder Aff. ¶¶ 7, 10; Duflot Aff. ¶¶ 6, 7.)  By his own admission, he prepared

Exhibit 2 to the English Agreement in English.  (Caron Aff. ¶ 14; Ryder Aff. ¶ 7.)  He wrote his

---

[3]The English Agreement contained the following provision (section 7) relative to its execution:  "*[t]he Employee specifically acknowledges that he or she has read, carefully considered, and understands this Agreement, that each of the terms and conditions of this Agreement are fair and reasonable, that he or she executes this Agreement voluntarily, and that this Agreement is not the product of fraud, duress or coercion . . . Further, the Employee agrees that this Agreement was fairly and fully bargained for in good faith prior to commencing employment with the Company, and that the terms and conditions of this Agreement, including those covenants in Section 4, do not constitute any impairment of the Employee's ability to pursue a livelihood during the Non-Compete Period.  To the extent that the terms and conditions of this Agreement, including those covenants in Section 4, constitute an impairment of the Employee's ability to work within his or her field of expertise during the Non-Compete Period, the Employee hereby agrees that this Agreement provides fair and adequate consideration for any such impairment.*" (Complaint, Ex. A.)

comments to his 2002 performance evaluation in English.  (Affidavit of Sybille de Monplanet

dated December 3, 2004, Exhibit A.)

Despite alleging ignorance of his non-competition obligations until this suit, Caron

affirmed his non-competition obligations to Cognex <u>seven</u> times during the course of his

employment regarding certain stock option grants.  Caron signed and initialed Cognex's "Stock

Option Agreement" ("SOA") – written in English – on seven separate occasions, commencing in

April 1999.  (<u>See</u> Affidavit of Diane M. Tracey and attached exhibits.)  Each time, Caron signed

a separate agreement and returned the executed version of the SOA to Cognex in Natick.

(Tracey Aff., ¶¶ 3, 4, 8, 9.)  The Agreements contained the following provision immediately

above the signature line[4]:

> 11.     Non-Competition:   The Optionee reaffirms his/her promise to be bound
> by the non-competition provision as stated in Section 4 of the Employee
> Invention/Non-Disclosure and Non-Competition Agreement between the
> Optionee and the Company (the "Employment Agreement").  And [sic] the
> Optionee agrees that any profits recognized by the Optionee pursuant to the
> exercise of this Option (along with other good and valuable consideration
> including, but not limited to, employment by the Company, salary and other
> Company-provided benefits) are sufficient consideration for the performance by
> the Optionee of the Optionee's obligations as stated in Section 4 of the
> Employment Agreement.

Caron also executed Employee Stock Option Grant Acknowledgments, written in

English, which affirmed Caron's non-compete obligation.  (Tracey Aff., Ex. A.)

Caron participated in two specialized training programs at Cognex's Massachusetts

headquarters relative to Cognex's products. (Ryder Aff. ¶ 8; Affidavit of Lia Emmanuel, ¶ 5.)

From May 4 – 7, 1998, Caron attended the first course, focusing on Cognex's MVS-8000 family

---

[4]This language is contained in the first two Stock Option Agreements, dated April 27, 1999 and February 16, 2000, respectively.  Four other Agreements, dated May 22, 2000, February 20, 2001, February 23, 2001 and February 11, 2002, contain a slightly revised version of the Non-Competition provision; in the revised version, Caron also affirms his non-competition obligation under the English Agreement and agrees that the stock option grant is consideration for such obligation.  (Tracey Aff., Ex. A.)

of products.  (Id.)  The second course from August 23 – 26, 1999 related to Cognex Vision

Library, a software development environment created and compiled by Cognex that contains a

number of proprietary "machine vision tools."  (Id.)

Additionally, Caron regularly received a high degree of supervision and support from

Cognex executive and management level personnel in Massachusetts. (Affidavit of Lowell

Jacobson, ¶¶ 4, 9 and e-mails attached thereto; Lacroix Aff. ¶ 6; Duflot Aff. ¶ 3.)  Through these

contacts and training in Natick, Caron gained intimate knowledge of:  Cognex's software

platforms and hardware configurations; Cognex's machine vision field installation procedures

and protocols; Cognex's current and prospective products and services, product development and

marketing plans; and Cognex's confidential customer lists and information.  (Lacroix Aff. ¶¶ 9-

12.)  Also during his employment, Caron accessed Cognex's confidential and proprietary

information via Cognex's internal website, CogNexus, which is managed and maintained in

Massachusetts.  (Jacobson Aff. ¶¶ 4-9.)

Caron resigned his employment with CI on or about June 16, 2003.  (Caron Aff. ¶ 25.)

Immediately following his resignation, Caron exercised his stock options and purchased stock in

Cognex.  (Tracey Aff. ¶ 4, Ex. B.)  By his own admission, Caron began work for a direct Cognex

competitor, Euresys, S.A., in or about October 2003.  (Caron Aff. ¶¶ 30, 31; Lacroix Aff. ¶ 19.)

<div align="center">Argument</div>

I.    This Court May Properly Exercise Personal Jurisdiction Over Caron.

A plaintiff opposing a motion to dismiss for lack of personal jurisdiction must make a

prima facie demonstration, using affirmative proof of facts necessary to establish personal

jurisdiction.  Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992).  In evaluating

whether plaintiff has met its burden, the Court "must consider specific facts affirmatively alleged

by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to

the plaintiff's jurisdictional claim." Workgroup Tech. Corp. v. MGM Grand Hotel, 246 F. Supp.

2d 102, 108 (D.Mass. 2003) (internal quotation omitted).  Under this standard, Caron's motion

must plainly be denied.

      A.     Forum Jurisdiction Clause In English Agreement Is Enforceable.

     The United States Supreme Court has held that forum selection clauses are "'prima facie

valid and should be enforced unless enforcement is shown by the resisting party to be

'unreasonable' under the circumstances.'" LFC Lessors, Inc. v. Pearson, 585 F. Supp. 1362,

1364 (D.Mass. 1984) ["LFC Lessors"], quoting The Bremen v. Zapata Off-Shore Co., 407 U.S.

1, 10 (1972) ["The Bremen"]; see National Equipment Rental Ltd. v. Szukhent, 375 U.S. 311,

315-316 (1964) (a defendant may waive his right to challenge personal jurisdiction through a

contractual forum selection clause).  More recently, in Carnival Cruise Lines, Inc. v. Shute, the

Supreme Court held that the forum selection clause on a cruise ticket identifying the forum for

all disputes as Florida (Carnival's principal place of business) was enforceable, despite that it

was part of a form ticket which was not subject to negotiation.  499 U.S. 585, 593-595 (1991).

     Massachusetts federal and state courts accept that forum selection clauses are valid and

enforceable, unless unreasonable.[5] LFC Lessors, supra; Jacobson v. Mailboxes Etc. U.S.A., Inc.,

419 Mass. 572, 574-575 (1995).  To establish that a particular choice-of-forum clause is

unreasonable, the standard in the First Circuit requires that "a resisting party must present

evidence of fraud, undue influence, overweening bargaining power or such serious

---

[5]Caron would have this Court believe that consent-to-jurisdiction clauses are only enforced "when reached in an arms-length negotiation 'unaffected by fraud, undue influence, or overweening bargaining power' by experienced and sophisticated businessmen."  Caron Memorandum, p. 6.  This is not the standard.  Specifically, there is no requirement that the parties to the contract be sophisticated businessmen, or that the contract be the product of an arms-length negotiation.  See Carnival Cruise, supra; Microfibres, Inc. v. McDevitt-Askew, 20 F. Supp. 2d 316, 322 (D.R.I. 1998) ["Microfibres"].

inconvenience in litigating in the selected forum that it is effectively deprived of its day in court." LFC Lessors, supra, quoting from Fireman's Fund Amer. Inc. Cos. v. Puerto Rican Forwarding Co., Inc., 492 F.2d 1294, 1297 (1st Cir. 1974) ["Fireman's Fund"].

Caron's position that the English Agreement's forum clause is unenforceable simply because it was not negotiated and part of Cognex's "standard form" contract, must fail.[6] In LFC Lessors, this Court held a forum selection clause contained in a "standard form contract" where "the boilerplate form language was in small print at the bottom of a page" valid and enforceable. 585 F. Supp. at 1364. The Court was not persuaded by defendant's argument, similar to Caron's, that the forum provisions were not called to his attention, discussed with him, or reviewed by counsel.[7] Id. The Court acknowledged the reasonableness of plaintiff's desire to maintain such forum provisions in its contracts, "given that plaintiff does business throughout the country." Id. The Court further opined that forum provisions stating that "Massachusetts courts have jurisdiction over all disputes will keep plaintiff from the undesirable position of having to defend or initiate lawsuits in courts all over the United States; it will also promote uniformity of result." Id. Caron has not credibly alleged or proven fraud,[8] undue influence, or overweening bargaining power[9] sufficient to render the clause unenforceable.

---

[6]Even assuming, arguendo, that Caron is correct in characterizing the English Agreement as a "contract of adhesion" – a position Cognex vehemently opposes – this would not render the forum selection clause unenforceable. Microfibres, 20 F. Supp. 2d at 324 (forum selection clause in contract of adhesion will be enforced if fundamentally fair); see also Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al., 170 F.3d 1, 19 n.16 (1st Cir. 1999) (adhesion contracts generally enforceable).

[7]See Arentowicz v. Cap Gemini Ernst & Young U.S. LLC, 2004 U.S. Dist. LEXIS 16536, *13-14 (D.N.J. 2004) (conclusory statement that agreement containing forum clause was non-negotiable was inadequate basis upon which to find that forum selection clause was the result of fraud, undue influence or unequal bargaining power).

[8]Caron's burden as to fraud is particularly difficult: he must prove that the forum clause's mere inclusion was the product of fraud or coercion. Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1970). Inferring only that he was misled into believing the English and French Agreements were identical, Caron has failed to meet this burden.

[9]Cases cited by Caron for the alleged disparity in bargaining power actually favor Cognex. In Chase Commercial Corp. v. Owen, the court, upholding the validity of a jury waiver, found the contract at issue, even if one of adhesion, was enforceable. 32 Mass. App. Ct. 248, 254 (1992). In Cheney v. Automatic Sprinkler, plaintiff did not met his burden of proving that a compensation forfeiture clause was unreasonable. 377 Mass. 141, 149 (1979). Kroeger v. The Stop & Shop Companies, Inc., where the court held that a post-employment forfeiture clause was

Caron's position that he did not read or understand the provisions of the English Agreement is untenable.  The traditional rule of contract law is that a person who signs a written agreement is bound by its terms whether or not he reads and understands them.  Tiffany v. Sturbridge Camping Club, Inc., 32 Mass. App. Ct. 173, 175 n. 5 (1992) citing Spritz v. Lishner, 355 Mass. 162, 164 (1969).  Moreover, Caron's English reading (and writing) skills were sufficient to permit him to send and receive many e-mails from engineers at Cognex's office in Natick relating to complex product configuration and support issues (see Jacobson Aff., Ex. A; Duflot Aff. ¶ 6), sufficient to permit him to access and understand proprietary and confidential information contained on Cognex's intranet (Jacobson Aff., Ex. B-D), and sufficient to permit him to prepare Exhibit 2 to the English Agreement, which Caron admits he prepared. Caron's English permitted him to provide his own comments – in English – on his performance evaluation for calendar year 2002.  (See de Monplanet Aff. dated December 3, 2004, Ex. A.) Also, quite significantly, CI employees who worked with Caron from the commencement of his employment in 1998, have stated under oath that his English speaking skills were very good, and certainly good enough to allow him to read and understand the English Agreement.  (See Ryder Aff. ¶¶ 7, 10, 11; Duflot Aff. ¶ 5; Jacobson Aff. Ex. A.)

Finally, Caron's position is undermined by his own Affidavit, and, particularly, by the "translation" thereof.  In his Affidavit (the French version), Caron states that he does not "speak English fluently."  (Caron Aff., French version, ¶ 3.)  Certainly, one does not need to speak English fluently to be able to read and understand a document written in English.  In the English version, however, upon which Caron would have this Court rely, it is represented that Caron stated that he does not "speak **or read** English fluently."  (Caron Aff., English translation, ¶ 3;

unenforceable as plaintiff's conduct was not wrongful, is inapposite.  13 Mass. App. Ct. 310, 320-321 (1982). Finally, Kirby v. Miami Systems Corp. has no precedential value.  1999 Mass. App. Div. 197 (1999).  The same is true for the Michigan, Minnesota and 9th Circuit cases cited by Caron.

Ryder Aff. ¶ 12.)  This purported "translation" is very misleading and should cause this Court to view with skepticism Caron's entire translated Affidavit (translated by a member of Caron's counsel's law firm).

Caron has also failed to demonstrate that, if the matter is litigated in Massachusetts, he would suffer "'such serious inconvenience . . . that [he] is effectively deprived of [his] day in court.'"  LFC Lessors, 585 F. Supp. at 1365, quoting from Fireman's Fund, 492 F.2d at 1297.  Added time and expense of litigating in Massachusetts fails to meet that standard.[10]  Moreover, Caron waived any defense that Massachusetts is an "inconvenient forum" by consenting to the inclusion of a forum clause in the English Agreement.  D'Antuono v. CCH Comutax Systems, Inc., 570 F. Supp. 708, 713 (D.R.I. 1983) ("subordinated his convenience to the bargain"); The Bremen, 407 U.S. at 16.

     B.    Constitution Permits Specific Personal Jurisdiction Over Caron.

Alternatively, this Court may exercise specific personal jurisdiction over Caron under the law.  "To establish personal jurisdiction, [a party] must show that the Massachusetts long-arm statute grants jurisdiction and, if it does, that the exercise of jurisdiction under the statute is consistent with the constitution."  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002), citing Foster-Miller v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st Cir. 1995).  Caron properly concedes that this Court may sidestep the statutory inquiry and proceed directly to the constitutional analysis, as the Commonwealth's long-arm statute is

---

[10]See Microfibres, 20 F. Supp. at 325 (conclusory allegations regarding financial difficulty by North Carolina employee relative to defending suit in Rhode Island brought by former employer do not render forum clause unenforceable); Arrow Plumbing and Heating, Inc. v. North American Mechanical Services Corp., 810 F. Supp. 369, 373 (D.R.I. 1993) (defendant's bankruptcy insufficient to avoid forum selection clause); Pugh v. Arrow Elecs., Inc., 304 F. Supp. 2d 890, 895 (N.D.TX 2003) (plaintiff's costs and inconvenience in traveling from Dallas to New York do not prevent enforcement of forum selection clause in employment contract).

"an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." Daynard, supra.

Whether the exercise of personal jurisdiction comports with due process requires a three-part analysis: (1) Cognex's claims must arise out of, or relate to, Caron's activities in Massachusetts; (2) Caron's contacts in Massachusetts must represent a purposeful availment of the privilege of conducting activities here, making his presence before the state's courts foreseeable; and (3) the exercise of jurisdiction must be reasonable in light of the "Gestalt factors" (defined in Section I.B.3. infra). Pike v. Clinton Fishpacking, Inc., 143 F. Supp. 2d 162, 168 (D.Mass. 2001) ["Pike"], quoting Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001). This Court's exercise of personal jurisdiction over Caron meets the Constitutional requirements.

   1. Cognex's Claims Relate To Caron's Conduct In Massachusetts.

"[T]he relatedness test is . . . a flexible, relaxed standard." Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994) ["Pritzker"]. Very little activity is required in Massachusetts to trigger personal jurisdiction over a party. See Ealing Corp. v. Harrods, Ltd., 790 F.2d 978 (1st Cir. 1986) (sending one telex to plaintiff in Massachusetts satisfies the requirements of c. 223A, § 3(a)); Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 931 (1st Cir. 1985) (four letters and one telephone call satisfy the relatedness test).[11] This test only requires that Caron's Massachusetts contacts be the foreseeable cause of Cognex's injuries. Pike, supra at 169, citing Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 715 (1st Cir. 1996) ["Nowak"]. Cognex has met its burden under this analysis.

Undisputedly, Cognex seeks to enforce restrictive covenants contained in the English Agreement, including Caron's covenant not to compete and his covenant not to divulge

---

[11]The constitutional "relatedness test" appears "congruous with the state long-arm statute's requirement that the plaintiff's claims 'arise from' the defendant's state transactions. Indeed the First Circuit once recognized that the two requirements correspond. See Foster-Miller, 46 F.3d at 144 n. 3." Pike, 143 F. Supp. 2d at 168.

confidential or proprietary information.  The very information Cognex seeks to protect by filing this action is information Caron gained from his contacts with Massachusetts.

Caron admits that he attended two lengthy training sessions in Massachusetts 1998 and 1999, where he learned Cognex's confidential and proprietary information.  (Emmanuel Aff. ¶ 5; Lacroix Aff. ¶¶ 9-21.)  Caron further admits that he exchanged e-mail messages with engineers at Cognex in Natick during his employment to obtain information relating to Cognex's products. (Caron Aff. ¶ 21; See Jacobson Aff. ¶¶ 4, 5, 9.)  By logging onto Cognex's intranet, CogNexus (maintained by Cognex in Natick), Caron was able to access further confidential and proprietary information.  (Jacobson Aff. ¶ 4-5; Lacroix Aff. ¶¶ 9-21.)  Most notably, Caron dealt with Cognex's products (designed and manufactured in Massachusetts) on a daily basis.  His primary duties and responsibilities included: providing technical solutions and long-term engineering support to customers regarding Cognex's software; providing start-up assistance to customers for Cognex's products; customizing Cognex's software; and managing Cognex's hardware platforms, which support Cognex's products.  (Lacroix Aff. ¶ 9; Second Lacroix Aff. ¶¶ 4-5.) Caron received the information, the products and the technical assistance from Cognex in Natick. Clearly, Caron's contacts to Massachusetts are related to Cognex's cause of action.

    2.    Caron's Deliberate Conduct And Repeated Contacts With Massachusetts Constitute "Purposeful Availment" Under Massachusetts Law.

Caron was issued seven (7) Stock Option Agreements ("SOA") for stock in Cognex – a Massachusetts corporation.  (Tracey Aff.  ¶¶ 3, Ex. A.)  Caron entered into the SOAs with Cognex during the period April 1999 through February 11, 2002.  (Tracey Aff. Ex. A.)  After executing and initialing each of the seven SOAs, Caron himself returned them to Cognex in Natick.  (Tracey Aff. ¶ 9, Ex. A.)  Caron exercised options for 2,650 shares of Cognex stock pursuant to the SOAs between July 10, 2003 and July 24, 2003.  (Tracey Aff. ¶ 4, Ex. B.)  Caron

subsequently sold the Cognex stock and realized a total of $6,828.50.  (Tracey Aff. ¶ 4.)  Based on these transactions alone, Caron could reasonably anticipate being haled into a Massachusetts court.  Bond, 764 F.2d at 932.  Caron was "participating in the economic life of Massachusetts" through these transactions.  Id. at 933.

Finally, Caron is likely using information gained from his Massachusetts contacts in his work for a Cognex competitor today.  (Lacroix Aff. ¶¶ 8-21.)  Caron was well-aware of the direct and substantial connection between his employment and the worldwide headquarters in Natick.  (Jacobson Aff. ¶¶ 3, 5; Lacroix Aff. ¶¶ 6, 7.)  These activities are certainly sufficient for this Court to conclude that Caron initiated, utilized and benefited from his contacts with Massachusetts, thereby satisfying the purposeful availment prong of the due process analysis.  See Burger King v. Rudzewicz, 471 U.S. 462, 475 n.18 (1985) ("so long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction") (quotation omitted); Energy Capital & Serv. LP, II v. Hill Refrigeration, 989 F. Supp. 353, 355 (D.Mass. 1997) ("the existence of the [one] bank account and the purposeful direction of communications into Massachusetts are sufficient to amount to 'transacting business'" within Massachusetts).

     3.     Exercising Personal Jurisdiction Over Caron Would Not Offend Traditional Notions of Fair Play and Substantial Justice.

An analysis of this element requires application of five so-called "Gestalt factors": (a) Caron's burden of appearing in Massachusetts; (b) the interests of Massachusetts in adjudicating the dispute; (c) Cognex's interest in obtaining convenient and effective relief; (d) the judicial system's interest in obtaining the most effective resolution of the controversy; and (e) the common interests of the respective sovereigns in promoting social policies.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980); Pike, 143 F. Supp. 2d at 170.

a.      Any Burden On Caron Of Litigating Here Is Not Onerous.

Caron must demonstrate that "'exercise of jurisdiction in the present circumstances is onerous in a special, unusual or other constitutionally significant way.'"  Pike, 143 F. Supp. 2d at 170 ("it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction"), quoting from Nowak, 94 F.3d at 718.  Caron has not met this burden.   See Pritzker, 42 F.3d at 64 (travel between New York and Puerto Rico creates no especially ponderous burden); Turpin v. Mori Seiki Co., 56 F. Supp.2d 121, 127 (D.Mass. 1999) (Massachusetts is appropriate forum for Massachusetts resident injured by Japanese machine).

b.      Massachusetts Has A Significant Interest In Adjudicating This Dispute.

"[S]overeigns have few interests greater than those in the conduct of forum-based litigation."  Pritzker, supra.  Massachusetts has a substantial interest in protecting the business and property of its residents.  See Digital Equip. Corp. v. AltaVista Tech., 960 F. Supp. 456, 471 (D.Mass. 1997).

c.      Massachusetts Is The Most Convenient Venue For Cognex.

The factor of Cognex's convenience also supports exercising jurisdiction over Caron. Massachusetts courts "'accord deference to' [plaintiff's] 'choice of a Massachusetts forum,' a forum more convenient for it than any other."  Digital, supra, quoting Nowak, supra.  Here, Cognex is a Massachusetts corporation seeking redress for Caron's unlawful competition, the harmful effects of which are felt in Massachusetts.  "Plaintiff's interests in convenient and effective relief is clearly served in Massachusetts."  Pike, 143 F. Supp. at 170.

d.      The Administration Of Justice.

Where, as here, the agreement giving rise to the litigation contains a choice of law provision, the scales tip in support of jurisdiction in Massachusetts.  Digital, supra.

e.    Policy Considerations.

This final factor "addresses the interests of the affected governments in substantive social policies." Nowak, supra at 719.  Massachusetts has an overriding interest in providing a convenient forum for residents, as well as in protecting the legitimate and significant business concerns arising out of a former employee's unlawful competition.  Id.  Contrary to Caron's assertions, France has no interest in this litigation as Caron resides in Belgium.

Thus, under the Gestalt factors, Massachusetts' exercise of jurisdiction is "reasonable and does not offend the notions of fair play and substantial justice."  Nowak, supra.

II.    Caron Fails To Overcome The Considerable Deference This Court Must Accord To Cognex's Choice Of Forum.

The federal common law doctrine of forum non conveniens applies where the alternative forum is another country. See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 722 (1994). In making a forum non conveniens determination, the First Circuit follows the paradigm established by the Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947), and its progeny. See Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1349-1358 (1st Cir. 1992) ["Mercier II"]; Mercier v. Sheraton Int'l, Inc., 935 F.2d 419, 423-30 (1st Cir. 1991) ["Mercier I"].

Recognizing that "the plaintiff's choice of forum should rarely be disturbed," Gulf Oil, 330 U.S. at 508, the Circuit imposes on the movant "the burden of proving **both** the availability of an adequate alternative forum . . . and the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum." Mercier II, 981 F.2d at 1349 (emphasis in original) (citations omitted) (extremely high burden where plaintiff resident of forum).

Where, as here, there are two parties to the dispute:

there is good reason why [the case] should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1)

13

establish such oppressiveness and vexation to a defendant as to be out of all
proportion to plaintiff's convenience, which may be shown to be slight or
nonexistent, or (2) make trial in the chosen forum inappropriate because of
considerations affecting the court's own administrative or legal problems.

Nowak, 94 F.3d at 720, quoting Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S.

518, 524 (1947).  Caron fails to carry this burden.

     A.     France Is Not An "Available" Or "Adequate" Alternative Forum.

The first prong of this two-part analysis is itself a two-tiered inquiry: is the alternative

forum (1) "available" and (2) "adequate."  See Mercier II, 981!F.2d at 1349-1350.  Here, Caron

fails to satisfy both requirements.

     1.     Caron Fails To Address The "Availability" Prong Of The Test.

Caron's motion should be denied simply because he conspicuously and not surprisingly

has failed to provide any analysis of the availability of a French forum.  See Id. at 1349 (citations

omitted).  Although Caron concedes he is a French national, he undisputedly is currently residing

in Belgium and is employed by a Belgian company.[12]  It is not clear that Caron would be subject

to the jurisdiction of French courts.  Nor has Caron expressly consented to submit to the

jurisdiction of French courts, to appear as a witness at a trial in France, or to be bound by a

judgment of a French court.  Even if, however, Caron did consent, it is not clear that French law

allows venue or jurisdictional defenses to be waived by litigants.  See Smith v. Chason, 1997

U.S. Dist. LEXIS 7637, *5 (D.Mass. 1997) (Court considers amenability of foreign court to a

party's waiver of venue and jurisdictional defenses under "availability" prong).  Thus, Caron

cannot overcome his significant burden of proving that France is an "available" forum.

---

[12]See translated Proof of Service at Tab B to Caron's Memorandum; see also Caron Aff. ¶¶ 30-31.

2.    France Is Not An "Adequate" Forum For This Litigation As Non-compete Clauses Are Unenforceable Under French Law.

"An alternative forum may be inadequate . . . if 'the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all.'" Mercier II, 981 F.2d at 1350, quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981). "[W]here the adequacy of the alternative forum is not established, it cannot be presumed, and a motion to dismiss for forum non conveniens must be denied." Hatzlachh Supply, Inc. v. Tradewind Airways Ltd., 659 F. Supp. 112, 114 (S.D.N.Y. 1987) (quotations omitted). See also Piper, 454 U.S. at 254 n.22 ("where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied."). See also Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F. Supp. 2d 54, 57 (D.D.C. 2003) (as France has not waived sovereign immunity of Libyan state, French courts not "adequate" because plaintiffs would be unable to bring instant claims against Libya in French courts).

France is not an "adequate" alternative forum because, as Caron himself concedes (Caron's Memorandum pp. 13, 15), the non-compete agreement at issue is "unsupportable" under French law. In sharp contrast, non-compete agreements have long been enforceable under Massachusetts law.[13]  See All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974); New England Tree Expert Co. v. Russell, 306 Mass. 504, 510 (1940). Cognex's two counts arise solely from its allegation that Caron violated the non-competition provision of their agreement. Thus, French courts are not an "adequate" alternative to this Court because dismissal of this case in favor of a French forum would, as Caron admits, preclude Cognex from receiving any relief at all. Piper, supra. The interests of justice militate against a French forum.

---

[13]A form of the non-competition agreement at issue here has consistently been ruled valid and enforceable by Massachusetts courts. Caron himself cites three such cases in Footnote 5 of his Memorandum (p.8), but misstates the disposition of Cognex Corporation v. Chiesa. Judgment did enter in favor of Cognex in that case. See Ex. "A."

B.    The Private and Public Interest Factors Support A Massachusetts Forum.

!    In order to sustain the present motion, Caron "must establish that the private and public interests weigh ***heavily*** on the side of trial in the foreign forum." Mercier I, 935 F.2d at 424 (emphasis added) (quotations omitted).   "Transfer is inappropriate if the effect is merely to shift inconvenience from the defendant!to the plaintiff." Omni Hotels Mgmt. Corp. v. Round Hill Devs., Ltd., 675 F. Supp. 745, 752 (D.N.H. 1987) ("Omni Hotels").  "In weighing these considerations, the trial court must favor the plaintiff's choice of forum: 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" Mercier II, 981 F.2d at 1354, quoting Gulf Oil, 330 U.S. at 509.   This deference accorded to the plaintiff's choice of forum "is enhanced . . . when the plaintiff is an American citizen who has selected an available American forum."  Id., citing, Piper, 454 U.S. at 256 n.23.[14]

1.    Caron Fails To Sustain His Enhanced Burden Of Showing That The "Public Interest" Criteria Weigh Heavily In Favor Of A French Forum.

The Supreme Court identified the "public interest" criteria, which favor a Massachusetts forum, to include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

!
Piper, 454 U.S. at 241 n.6.  See also, Mercier II, 981 F.2d at 1354.

First, a choice of law provision in the English Agreement requires that Massachusetts law apply to this dispute.  See English Agreement, ¶ 12; see Gulf Oil, 330 U.S. at 509 ("There is an

---

[14]See also, Mizokami Bros. v. Baychem Corp., 556 F.2d 975, 977 (9th Cir. 1977) ("a defendant must meet an almost impossible burden in order to deny a citizen access to the courts of this country") (cert. denied, 434 U.S. 1035 (1978).  To the extent this Court finds upon consideration of the "private and public interest" factors that neither forum emerges as more appropriate than the other, this case should not be dismissed. See Mercier I, 935 F.2d at 428 ("[T]his general equipoise, combined with the presumption favoring a plaintiff's choice of forum, dictates that the . . . interest factors weigh[] in favor of retaining jurisdiction.").

appropriateness. . . in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.").  Furthermore, Massachusetts has a strong, specific interest in the litigation to see that its law is enforced and properly applied.  See, e.g., DiRienzo v. Philip Serv. Corp., 294 F.3d 21, 32-33 (2d Cir. 2002). Massachusetts also has a significant interest in this litigation because Cognex's corporate headquarters are located in Massachusetts.   Finally, Cognex has claimed and is entitled to a jury trial on issues so triable. See Complaint, p.10.  Cognex would lose that right if the case were dismissed in favor of a French forum because France does not provide jury trials in civil cases.  See Everett/Charles Contact Products, Inc. v. Gentec, 692 F. Supp. 83, 88 (D.R.I. 1988).

      2.     The "Private Interest" Factors Tip The Scales In Favor Of A Massachusetts Forum.

The Supreme Court identified "private interest" factors, which also favor a Massachusetts forum, to include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained.

!
Gulf Oil, 330 U.S. at 508.  See also, Mercier II, 981 F.2d at 1354.

Regarding access to sources of proof, Caron, a party and arguably the central witness, is subject to the jurisdiction of Massachusetts courts by virtue of an express contract.  English Agreement, ¶ 12.  It is at best unclear whether Caron, who resides and works in Belgium, is subject to the jurisdiction of French courts, would appear as a witness at trial in France, or would be bound by a judgment of a French court.

Caron offers nothing more than a conclusory statement that all witnesses who may be called to testify at trial "reside in or near France."  See Caron's Memorandum, pp. 16-17.  Parties moving for dismissal on the basis of <u>forum</u> <u>non</u> <u>conveniens</u> make a more specific showing.  See Omni Hotels, 675 F. Supp. at 752 ("[C]onclusory allegations of need as to unnamed witnesses and unspecified evidentiary materials are insufficient to establish the clear showing mandated by Gulf Oil Corp.").

To the extent European nonparty witnesses agree to appear at trial, any logistic or cost issues are rendered a nullity by this Court's state-of-the-art videoconferencing capability. Witnesses in France or other European countries can testify easily in this Court via video link. Further, videotaped depositions obtained through letters rogatory can be used at trial in lieu of live witness testimony.  See In re Lernout & Hauspie Securities Litigation, 208 F. Supp.2d 74, 93 (D.Mass. 2002).   In addition, translators can be used with witnesses who do not speak English, a common practice in federal courts.

Many documents Cognex will rely on at trial are located in its Massachusetts headquarters.[15]  (Complaint, Ex. A; Tracey Aff. ¶¶ 2, 4, 8, 9.)  All of these documents are in English.  (See Complaint, Ex. A; Tracey Aff.. Ex. A.)   This case largely involves the interpretation of an employment agreement written in English.  See English Agreement. Translation of the most important document (the English Agreement) would not be necessary if the case remained in this Court.[16]  In light of these considerations, the "private interest" factors require trial in Massachusetts.

---

[15]Caron fails to "identify the location of sources of documentary evidence that is likely to contain relevant and material information" (See Caron's Memorandum, pp.16-18) which this Court required of a similarly-situated litigant in another case.  See Thomson Info. Services Inc. v. British Telecommunications, PLC, 940 F. Supp. 20, 25 n.3 (D.Mass. 1996).

[16]This Court should prefer that the fact-finder review the English Agreement in its original, native language. See Everett/Charles, 692 F. Supp. at 88 ("[B]ecause the contractual documents involved here were written in English,

III.    <u>Service of Process Was Proper.</u>

Caron is not entitled to dismissal on the basis of insufficiency of service of process.  As Caron acknowledges, the Hague Convention of 1965 on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters [the "Hague Convention"] governs the service of process on individuals in signatory countries.  Both United States and Belgium are signatories to the Hague Convention.  <u>See</u> 20 U.S.T. 361, reprinted in Fed. R. Civ. P. 4, App.

Although the principal method of service under the Hague Convention is through the Central Authority of a member State (<u>see</u> Hague Convention, Art. 3), Article 10 of the Hague Convention permits service by others, including "judicial officers or other competent persons of the State of destination." Hague Convention, Art. 10.[17]  Included in this alternate group are *hussiers de justice* (process servers).  <u>See</u> Hague Conference on Private International Law, <u>Hague Convention, Outline of the Convention</u> at 2 (April 2004) ("The Convention also provides for several alternative methods of transmission [ . . . including] transmission of documents to be served from one process-server (*hussier de justice*) to another"); Permanent Bureau of the Hague Conference on Private International Law, <u>Practical Handbook on the Operation of the Hague Convention</u> at 61-64 (July 2003 ed.) (provisional edition) (same & collecting cases).[18]

In Belgium, where Caron was served, service of process through the national office of *hussiers* is proper and satisfies the requirements of the Hague Convention.  <u>See</u> <travel.state.gov/law/Belgium_legal.com> (last visited November 23, 2004) (Department of State website providing information regarding service of process in Belgium under the

---

they would have to be translated into French should this case be heard in France. Since a large part of this action involves interpretation of the contract, it would be preferable to review the language of the contract in its original form.").

[17]The Hague Convention permits signatory States to declare an opposition to service pursuant to Article 10 (i.e. by judicial officers, officials, or other competent persons of the state of origin).  <u>See</u> Article 10 & Article 21(2)(a). Belgium has not stated any such objection. <u>See</u> Fed. R. Civ. P. 4, App. n. 2 (declarations of Belgium).

[18]Relevant excerpts from these sources are included in Cognex's Appendix, filed simultaneously herewith.

Hague Convention).[19]  Cognex satisfied the requirements of the Hague Convention by

having service made by a bailiff through said office.[20]  Service of process was effective.

<div align="center">Conclusion</div>

As early as 1957, the Supreme Court noted that "a trend is clearly discernable toward

expanding the permissible scope of state jurisdiction over foreign corporations and other

nonresidents . . . [M]odern transportation and communication have made it much less

burdensome for a party sued to defend himself in a State where he engages in economic

activity." McGee v. Int'l Life Ins. Co., 355 U.S. 220, 222-223 (1957).  For all of the foregoing

reasons, Caron's motion to dismiss for lack of personal jurisdiction, for forum non conveniens,

and for ineffective service of process must be denied in its entirety.

<div style="margin-left: 45%;">
COGNEX CORPORATION,<br>
By its attorneys,<br>
<br>
<br>
/s/ James E. O'Connell, Jr.<br>
James E. O'Connell, Jr., BBO# 376475<br>
Jennifer A. Yelen, BBO# 565205<br>
PERKINS SMITH & COHEN LLP<br>
One Beacon Street<br>
Boston, Massachusetts 02108<br>
(617) 854-4000
</div>

Dated:  December 10, 2004

---

[19]True and accurate copies of the website pages are included in Cognex's Appendix, filed herewith.

[20]Caron argues that service here is improper because the bailiff's return of service states that service was made in accordance with two Agreements to which Belgium, but not the United States, is a party.  These references do not make the process invalid.  The Hague Convention provides that service should be made either "by a method prescribed by [the State's] internal law for the service of documents upon persons who are within its territory" or "by a particular method requested by the applicant, unless such method is incompatible with the law of the State addressed."  Hague Convention, Art. 5.  The Hague Convention further provides that the certificate of service "shall state that the document has been served and shall include the method, the place, and the date of the service and the person to whom the document was delivered."  Hague Convention Art. 6.  Here, both criteria were met, and Caron does not argue otherwise.  The method of service was in accordance with Belgian law, and all of the required information is included in the Proof of Service (Ex. B to Caron's Memorandum).